SAVANNAH SUGAR REFINERY, DIVI-
SION OF SAVANNAH FOODS AND
INDUSTRIES, INC., Appellant,

v.

RC CANADA DRY BOTTLING COMPA-
NY, DIVISION OF BEATRICE
FOODS COMPANY, Appellee.

Court of Appeals of Kentucky.

Sept. 14, 1979.

Rehearing Denied Nov. 2, 1979.

Discretionary Review Denied
March 4, 1980.

Robert L. Hallenberg, Fielden Woodward, Woodward, Hobson & Fulton, Louisville, for appellant.

Charles G. Middleton, III, Gerald Kirven, Louisville, for appellee.

Before GUDGEL, HOWARD, HOWERTON and PARK *, JJ.

HOWERTON, Judge.

Savannah Sugar Refinery appeals from a judgment of the Jefferson Circuit Court awarding RC Canada Dry Bottling Company $16,119.74, and dismissing Savannah's counterclaim for $475,892.62. The allegations of error relate to the interpretation of a contract between the parties.

The price of sugar had been fairly stable prior to 1974. The parties had contracted to sell and buy sugar on four occasions. Each of the four contracts contained a provision that "any portion of this contract that is unshipped after (the contract date) will be cancelled."

The sugar market became extremely volatile in 1974, and in order to provide some stability, the parties entered into two longer-term contracts with fixed prices. The new agreements omitted the cancellation clause.

The first of the new contracts was entered into on September 4, 1974. It was for a specific quantity of sugar at a fixed price for the period from October 1974 through March 1975. Prices continued to rise, and RC purchased the agreed amounts at the agreed price. A small portion of the September contract was not ordered and delivered until after March 31, 1975, but the contract was finally completed at the agreed price which at the time remained below the current market price.

The second identical contract was entered into on October 25, 1974, covering sugar prices and purchases from January through June 1975. The essential terms of that agreement are as follows:

1. Refined sugar quantity is 22,920 cwt. refined sugar solids for delivery January 1, 1975, through June 30, 1975. This sugar is to be shipped in equal amounts of 3,820 cwt. during each of the six months at $46.66 per cwt. delivered and is subject to a 2% discount . . . .

2. In the event all sugars purchased under this agreement are not delivered at the end of such period outlined in paragraph 1, the remaining portion purchased for delivery during such period will be invoiced at the applicable F.O.B. Savannah price and the invoice will be due and payable under our regular terms of 2% 10 days, net 11 days. Shipments made after such period will be applied against said invoice until delivery of the remaining portion is completed with the applicable freight being billed as shipments are made. Any increase in freight will be for the account of Royal Crown.

---

* Judge Park sat as a member of the panel hearing oral arguments, but resigned prior to the panel decision.

3. In the event all sugar purchased under this agreement are (sic) delivered prior to the end of the period, additional shipments will be invoiced at quoted list price on date of shipment, subject to our regular terms.

By the end of March 1975, the current market price was below $46.66, but it was above the September contract price of $36.18. RC officials decided not to take delivery of any more sugar under the October contract. They planned to wait until after June 30, 1975, with the intention of purchasing their sugar needs at a cheaper price. RC did purchase approximately 16,000 cwt. of sugar at a cheaper price from other suppliers during the period in order to meet its needs. Savannah was made aware of this plan on or about March 28 or April 2 of 1975.

Savannah requested RC to take delivery of the remaining quantity at $46.66 per cwt., but RC refused. RC did request delivery of the unpurchased portion of 19,090 cwt. at the June 30 Savannah price of $22.00. Savannah refused to comply with this request. RC then purchased sugar elsewhere at a slightly higher price, and the trial court concluded that RC thereby sustained damages in the amount of $16,119.74.

Savannah argues that the contract has a clear meaning, that it is not ambiguous, and that any conflict among terms in the contract should be reconciled so as to give the contract its general effect. The trial court's interpretation of the contract was based on oral testimony, which Savannah argues was erroneously admitted.

The October written contract appears to be clear in that RC was to purchase 22,920 cwt. at $46.66. If part of the sugar was not to be delivered until after June 30, any extra freight cost would be paid by RC. Also, shipments of sugar made after the period would be charged to the agreement until the remaining amount had been delivered and the contract was completed. Furthermore, if 22,920 cwt. was ordered and delivered prior to June 30, and if additional sugar was purchased, the price would be the current market price, whether more or less than the agreed $46.66 per cwt.

There appear to be two potentially ambiguous problems with paragraph 2 of the contract. The word "applicable" in the phrase "applicable F.O.B. Savannah price" undoubtedly caused some problem for the trial court and made it easier to misinterpret the contract as it did. It could be argued that "applicable" applies to the price on June 30, but when we read the entire contract, we cannot give the terminology such a meaning without extraneous evidence. There may also be some ambiguity concerning what amount is to be paid above the contract price of $46.66 after June 30. The regular price was to be $46.66 delivered. The first part of paragraph 2 provides that the late price will be $46.66 plus freight, while in the last sentence of this paragraph, the only extra charge is for increases in freight costs. This ambiguity has not been considered or resolved, but it will probably present some problem on remand of the case in order to determine Savannah's damages for RC's breach.

Savannah's first argument is that the trial court erred in holding the contract to be ambiguous. Actually, we fail to find where anyone has found or argued that the contract is ambiguous, except for our own considerations in the previous paragraph. What the trial court did, however, was to accept some alleged oral representations interpreting the contract which were made by a broker selling Savannah's sugar. On the basis of the statements, the trial court concluded that the phrase "applicable F.O.B. Savannah price" meant the market price on June 30.

Such an interpretation provides a completely onesided and unrealistic concept of "price protection." The interpretation is an extreme departure from the language of the written agreement. We do wonder what argument RC would have made if it had not taken the agreed amount of sugar before June 30 and the Savannah price was then higher than the contract price. Such was the situation with the September contract, but Savannah sold and RC bought the remaining undelivered sugar at the agreed price.

■ Savannah argues that it was error for the trial court to admit the testimony concerning the alleged oral interpretation of the contract. We are not so concerned with the fact that the trial judge heard and considered the testimony as we are with the result he reached with it. The trial judge relied on *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969), and *Hall v. Hamlin*, Ky., 484 S.W.2d 853 (1972), as authority to admit the oral representations. We do not find either case particularly appropriate, but parol evidence is admissible to explain or supplement the meaning of a written contract, if it relates to a course of dealing or a usage of trade, or if it concerns a course of performance. KRS 355.2–202, 1–205 and 2–208.

RC's course of dealing with Savannah had been through a broker named Anderson. After receiving the new contracts from Savannah, Anderson was asked by a Beatrice employee named Perry if the new contracts provided "price protection." Anderson allegedly assured Perry that they did. Perry interpreted the assurance to mean that if the market price went up, the contract price remained as agreed, and that if the market price declined, RC was not obligated to make purchases until the end of the contract period and it could then purchase sugar from Savannah at the reduced price. The trial judge accepted this interpretation, although Anderson denied making such an assurance.

Anderson is an independent broker. He had no access to the written contract, nor did he prepare the terms. The contract was sent directly by Savannah to the customer for execution. When an allegation is made by an agent, the question of his authority, or whether his action is ratified, becomes an issue. There has definitely been no ratification by Savannah, and the alteration would definitely exceed Anderson's authority according to his contract with Savannah.

■ When an apparent authority is claimed to arise from representation or conduct, the acts or statements of the principal must be looked to for the requisite foundation and not to those of the agent. The principal must affirmatively hold the agent out to the public as possessing sufficient authority to modify the contract, or else voluntarily, and with due awareness, permit the agent to act as if he has the required authority. The person claiming reliance on an agent's apparent authority must take heed to warnings and inconsistent circumstances. *Williston on Contracts* § 227A (3rd ed. 1959). We are not convinced by the totality of the circumstances in this case that Anderson had the necessary apparent authority to enable RC and Beatrice to rely on the alleged representations to modify this contract.

■ A buyer is bound to know the extent of the authority of a salesman and to act with reasonable diligence to make inquiries when a sale is unusual. *Peaslee-Gaulbert Co. v. Rogers*, 220 Ky. 338, 295 S.W. 137 (1927). Here, the only inquiry was made of the salesman. In *Peaslee*, Rogers sought to return some merchandise and maintained that the salesman had given him that option. Peaslee argued that the salesman had no authority to make such a sale and did not make such a contract. Rogers failed to show that Peaslee had any knowledge of the claimed contract, and Peaslee was therefore not bound if the agent had no authority to make such an agreement. A purchaser should only presume an agent's right to sell in the usual manner, and an agent may only sell upon terms reasonable and in conformity with the usage of trade. It is only to this extent that a salesman is acting with apparent authority.

■ Anderson had been a broker for Savannah for many years, and RC had purchased Savannah sugar through Anderson. The new contracts, however, were completely different, and they eliminated the cancellation clauses previously enjoyed by RC. RC and Beatrice should have made an inquiry directly with the contracting party to resolve any doubts concerning the inter-

pretation of the contract. It would be reasonable to accept a mere statement that the contract provides "price protection," but a reasonable interpretation would be that all parties are protected. RC can purchase 22,920 cwt. at $46.66 over the next six months, no matter how high sugar prices may go. Savannah has made a sale of that amount and can buy or hold an inventory to satisfy the sale. Savannah is also protected.

Express terms of an agreement and an applicable course of dealing or trade usage shall be construed as being consistent with each other whenever reasonable, but whenever such construction is unreasonable, the express terms control both a course of dealing and trade usage. KRS 355.1–205(4). The same considerations and principles apply to a course of performance. KRS 355.-2–208.

If RC is relying on a course of dealing or trade usage for its interpretation of the contract, it is obviously inconsistent with the express terms of the written agreement. RC has not convinced this court that such a lopsided view of "price protection" was ever an established course of dealing or trade usage in the sugar business; but, even if it was, the course of dealing between RC and Savannah was obviously changed by the September and October contracts.

Savannah also argued for a reversal on the basis of the doctrines of contemporaneous construction and inconsistent positions. Because of the conclusions already reached in this opinion, we decline to decide either of these issues.

We conclude that the trial court erred in its interpretation of the contract and by awarding damages to RC and Beatrice. We determine that it was RC that breached the contract. On remand, the trial court must make the necessary findings to determine the total damages sustained by Savannah and what reductions might be appropriate due to any mitigating circumstances.

The judgment of the trial court is reversed and remanded.

All concur.