BOARD OF REGENTS OF KENTUCKY STATE UNIVERSITY in their official capacity and their successors in office, Appellants/Cross–Appellees,

v.

Dr. Steven H. GALE, Ph.D., Appellee/Cross–Appellant.

Nos. 93–CA–0921–MR, 93–CA–1055–MR (Cross–Appeal).

Court of Appeals of Kentucky.

March 31, 1995.

William E. Johnson, J. Guthrie True, Stoll, Keenon & Park, Frankfort, for appellant/cross-appellees.

Steven G. Bolton, Frankfort, for appellee/cross-appellants.

Before GARDNER, McDONALD and WILHOIT, JJ.

McDONALD, Judge.

The appellant, Board of Regents of Kentucky State University (hereinafter "KSU"), has appealed from the judgment of the Franklin Circuit Court which determined that the appellee, Dr. Steven H. Gale, has tenure in the University's Endowed Chair in the Humanities. It is this sole legal conclusion reached by the trial court that is the subject of this appeal. To understand the controversy and the perspective of the parties, it is necessary to set out background information.

Prior to Dr. Gale's arrival at KSU in 1988, the institution had no experience with endowed chairs. Raymond Burse, president of KSU at the time the contract with Gale was entered into, testified as follows:

Q Tell me if you will a little about how it came about that you established the endowed chair, what the rationale was for its establishment?

A Okay.

I guess we—I guess the general assembly and the governor, feeling that higher education needed a boost, basically allocated a lump sum of money to the higher education community to establish endowed chairs and centers of excellence at the public universities in Kentucky.

The process evolved such that the universities had to submit proposals or applications in competition with one another for those endowed chairs. I think initially there were 4 endowed chairs and I think

maybe 4 centers of excellence or maybe more than that in the centers of excellence.

So there was a limited amount of funds.

We submitted an application or proposal for the establishment at Kentucky State of an endowed chair in the humanities. And the driving force for a chair in the humanities was associated with the mission of Kentucky State had changed over the years from what I call a limit comprehensive university to a liberal studies and arts focus institution.

*And we saw the endowed chair as one further step in solidifying that mission at Kentucky State in terms of bringing on board someone who had a reputation in the humanities field and nationwide, someone who had a research and publication background, one who could bring sort of new life or new fire to the Kentucky State University campus.*

And I think I may have described even to Dr. Gale as being sort of a gadfly to demonstrate to the faculty members at Kentucky State, you can teach and be a good teacher but you can also do research and good scholarship.

And that's really the process that led to the development of the endowed chair at Kentucky State.

Q As I understand the concept of the endowed chair, the function is partially to teach, because certainly that's the function of any faculty member is to impart knowledge to the students, but also to create a resource, if you will, of research and publication that is available to the university community as a whole, would that be accurate?

A Yeah. I think it is that. *What people or institutions try to do with endowed chairs, there becomes sort of the premier positions at the institution. You bring in a scholar of note who is there and there is at Kentucky State because it is primarily a teaching institution.* There is a teaching focus, but also a research and scholarship base. (Emphasis added).

Burse and others testified that a search committee was established in 1987 to find the appropriate academician to fill the "premier" position at KSU. Gale responded to an advertisement for the job which did not specify any term limitations on the position.[1] Gale, whose credentials are indeed impressive,[2] was ultimately chosen by Burse and the committee to occupy the Chair.

The actual employment offer extended to Gale on May 31, 1988, by KSU which he accepted reads:

Dear Dr. Gale:

This letter comes to formally offer to you the position of *Professor of Humanities at Kentucky State University's Endowed Chair in the Humanities.* This offer includes the following terms—(emphasis added).

[Items 1–16 contained various emoluments of the position including salary ($60,000 initially), rank, insurance and other perquisites, including parking fees, a computer, tickets to athletic events and free tuition to family members.]

This letter encloses all of the terms which we have discussed and those on which I have agreed, and constitutes the offer of employment to you from Kentucky State University.

This appointment will be subject to ratification by the University's Board of Regents at its next meeting; however, employment will begin upon acceptance of this offer.

---

1. The advertisement read in part: "Kentucky State University is seeking to fill an Endowed Chair in the Humanities in its newly established Center of Excellence in Liberal Studies. The Chair has been designed for an eminent scholar known for his/her excellence in teaching, quality research, and leadership ability.... *The holder of this chair* will have the rank of professor and will demonstrate his/her expertise through the teaching of two undergraduate courses per semester in the Humanities, by heading research efforts and sparking initiatives in other faculty members, through special lectures, and through writings and publications." (Emphasis added).

2. His 21-page, single-spaced curriculum vitae lists numerous scholarly and creative works he has written, including 10 books, 52 parts of books, 44 articles, 1 textbook, 25 essay reviews, as well as many, many honors and awards and professional memberships.

I have enclosed copies of the Endowed Chair Proposal, 1988–90 Academic Calendar and Faculty Handbook for your information.

Members of the staff, in particular MacArthur Darby, have been alerted to the provisions of this offer and during my vacation will be in a position to implement these terms.

> Sincerely,
> /s/ Raymond M. Burse
> Raymond M. Burse
> President

The minutes of the Board of Regents' Meeting of July 18, 1988, contain the following relevant information:

> [Darby, Executive Assistant to the President,] stated that Dr. Steven Gale emerged as the person to whom an offer was made and accepted, and that Dr. Gale would work closely with Integrative Studies and the College of Leadership Studies. He stated that the Board acting as a committee of the whole noted the impressiveness of Dr. Gale's credentials and *approved the recommendation that he be appointed to the Endowed Chair in the Humanities* at the rank of Professor with tenure.

Upon the request of chairman Tucker, Regent Clark noted the significance and importance of the endowed chair. He stated that the appointment to this kind of position was a first as a result of funding of such a position by the Kentucky General Assembly.

> It was moved by Regent Clarke and seconded by Regent Frailie that the Board of Regents approve and ratify *the appointment of Dr. Steven Gale to the Endowed Chair in Humanities* at the rank of Professor with tenure effective immediately. The motion passed unanimously.

(Emphasis added).

As far as we can discern from the record, KSU has never been unhappy with Gale's performance as a teacher or researcher. At least no such claim has been alleged. However, what is clear is that the administrators at KSU had a difficult time in coming to grips with the nature of an Endowed Chair.

That this is true is clear from the following testimony of Governor Nunn:

D24   Was there ever any discussion about Dr. Gale's performance with either Mary Smith, or Dr. Raymond Burse, or Dr. Wolfe?

A   Perhaps several occasions with Mary Smith and perhaps several occasions with Dr. Wolfe. They were primarily— the first serious one that I remember was when they went to Dr. Gale's home and took away all of the equipment that he had been assigned and had at his residence to work with and perform his responsibilities as an Endowed Chair. That was the first and most serious one.

There were controversy about his expense accounts. They didn't want to pay for him purchasing certain film, mileage, and various and sundry things. And it was brought to my attention and I made inquiries about it and tried to determine what the problems were, and then passed them on to the acting president and the president saying that this was the University's first Endowed Chair, that people would be looking at it, that part of it was being paid for out of private funds, and every effort should be made to resolve these problems, and that we couldn't expect to get another Endowed Chair if we were going to have so much trouble with the one that was there.

D25   So you basically directed the—

A   (Interrupting). No, I didn't direct anybody to do anything. I didn't direct anyone while I was at Kentucky State to do anything. I suggested that they should try to resolve problems. I did call their problems to their attention, but
. . .

D25   All right. How would you do that? You would talk to Gale, and then you would call President Wolfe or Acting President Mary Smith and say we seem to be having a problem here?

A   Sometimes I would write; sometimes I would be there at the University and go in and talk with them about it. I remember when Dr. Gale was moved out, he asked me to come to his office, if you

could call it an office, and I went over to a little concrete room that looked about like a jail cell that they had thrown all of his things into, and he was hunkered down there in the corner complaining; and I thought it was an unusual place for an Endowed Chair and suggested that they ought to look into it and see if they couldn't resolve this problem.

D27 When problems were resolved, were you informed of those?

A Sometimes—I don't know that they were ever resolved. I looked back through some correspondence that I had from Dr. Gale in which he said that the matters that he had discussed with me were being resolved and not to bring the matters before the Board, and then within a few days there would be another letter saying that that had been resolved but something else was occurring.

So my observation at the time I was at Kentucky State was there was constant conflict between Dr. Gale and the administration at the University in one form or another.

According to the Endowed Chair Proposal, referenced in the offer sent to Gale in May 1988, KSU wanted a person who would "meet rigorous qualifications and expectations" and who would "help to consolidate into a central focus Kentucky State's liberal studies mission" and "strengthen the long-standing effort of KSU toward excellence and vindicate the concept of its uniqueness within the Kentucky system of higher education." Inexplicably, when it got such a person it either begrudged him of or denied him the tools he needed to carry out the "mission." The testimony of Gale, Nunn, Burse and others is clear that KSU was not familiar with the nature or concept of an endowed chair or the protocol attendant to the position.

Most controversies were worked out, but one continued to nag the parties. KSU insisted that Gale did not have tenure in the chair. On the other hand, he was adamant that his contract gave him tenure in the chair. KSU made several attempts to get Gale to execute a contract that would place a time limitation on his contract. He consistently refused. On April 28, 1992, he was informed that unless he executed the contract approved by the board, KSU would consider him to have decided not to continue as the Endowed Chair. On May 15, 1992, Gale commenced this action seeking a declaration of his rights under the 1988 employment contract and an injunction preventing KSU from interfering with his position as the Endowed Chair. Dr. Mary Smith, then the president of KSU, attempted to reassign Gale to the position of professor, increasing his teaching duties and lowering his salary by approximately $20,000. In August 1991, finding that Gale would be irreparably harmed, particularly in loss of professional status and inability to complete publication commitments, the trial court enjoined KSU from taking any action to remove Gale from the Endowed Chair.

After a trial on the merits, the trial court concluded as follows:

1. The relationship between the Plaintiff and the Defendant University is governed by the offer of employment in the letter from President Raymond M. Burse to the Plaintiff dated May 31, 1988. This letter specifically offered Dr. Gale the position of "Professor of Humanities at Kentucky State University occupying the University Endowed Chair in the Humanities." Among other terms, the letter specifically at No. 3 offered "tenure upon appointment." There is nothing in the letter to indicate that the tenure was time limited or restricted. A reading of the letter, along with the general practices in the higher education community, would lead one to conclude that the offer was for tenure in the Endowed Chair.

We have set forth the facts in such detail to show the environment in which the parties found themselves in 1988 when the contract was entered. It was this environment, and in particular the customs evident in the hiring of one chosen to hold an Endowed Chair, that swayed the fact finder that Gale had tenure in the chair.

■ KSU would have us interpret the 1988 contract as giving Gale tenure in a professorship with the "opportunity to 'occupy' the Endowed Chair." It insists that, if

tenure were to run with the chair, the contract would have provided for "tenure upon occupation," rather than "tenure upon appointment." Such a strained interpretation is ludicrous when one looks not only at the custom and practice attendant to finding and hiring a suitable candidate, but in an examination of the plain words of the contract and the minutes of the board approving the contract. Gale was not offered just any professorship at KSU; he was offered the only professorship "occupying the University's Endowed Chair in the Humanities." He was offered "tenure upon appointment." The advertisement for the position, the mission of the search committee, the minutes of the Board of Regents, the testimony of Gale and others support the trial court's findings and conclusions that KSU was looking for an eminently qualified scholar to occupy the prestigious chair and that he or she would be the "holder" of the chair subject only to loss of the elevated status for cause. Clearly the "appointment" to which Gale was given tenure was in the Endowed Chair.

■ KSU argues that in a contract "all words and phrases are to be given their ordinary meanings." That obviously is a cardinal rule whenever an issue of contract interpretation is presented. *O'Bryan v. Massey–Ferguson, Inc.*, Ky., 413 S.W.2d 891 (1966). However, we can find nothing in the plain words of the contract that remotely suggests that Gale was hired to serve in any capacity other than the holder/occupant of the Endowed Chair. Accordingly, were we to accept the appellant's argument that the contract is not ambiguous, we would still affirm the trial court's judgment.

■ The trial court held that the contract was ambiguous and utilized well recognized rules of contract construction and looked at the context in which the contract was negotiated to ascertain the intentions of the parties. In *Greene v. Howard University*, 412 F.2d 1128, 1135 (D.C.Cir.1969), the court noted:

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is.

The evidence relied upon by the trial court in the instant case showed that, unless the advertisement for the position otherwise indicated, it was customary and understood within the academic community that the chair was to be occupied by a distinguished colleague for his life time. There being an absence of any time limitation in either the advertisement or contract itself, the trial court was correct in applying the usual practices surrounding the contractual relationship. *See Savannah Sugar Refinery, Division of Savannah Foods and Industries, Inc. v. RC Canada Bottling Corporation, Division of Beatrice Foods,* Ky.App., 593 S.W.2d 880 (1980), and *Old Republic Insurance Company v. Ashley,* Ky.App., 722 S.W.2d 55 (1986). Interestingly, KSU does not attempt to argue that the trial court's findings of the customs surrounding endowed chairs are other than sufficiently supported by evidence of record.

Not only does custom in academia support the trial court's resolution of the contract, but common sense imposes the result reached. The appellant does not suggest, nor can we imagine, how KSU could expect to attract a professor with the caliber necessary to fulfill the appellant's expectations for the Endowed Chair, *see* note 1 *supra*, without offering tenure in the chair itself. In fact, to give credence to KSU's interpretation of the contract would be tantamount to approving a "bait and switch" scheme to lure renowned scholars for a short stint in the Endowed Chair before being relegated to the rank and file.

KSU further argues that the trial court erred in construing the contract as one running in perpetuity. While this might be the general rule where a contract is silent as to its duration, it is not applicable here because the contract specifically concerns tenure. "Tenure," as utilized by the parties and understood in the teaching profession, embraces the concept of permanent security in the academic position one holds. Either Gale had tenure or not depending on the parties' intentions as gleaned from the written document. The issue is not one appropriate for resolution by the mechanical application of a general rule of construction, if a different

interpretation is evident from the document itself.

Next KSU argues that the trial court's judgment offends KRS 164.360(1) and (2), which read:

> (1) Each board of regents may appoint a president, and on the recommendation of the president may, in its discretion, appoint all faculty members and employees and fix their compensation and tenure of service, subject to the provisions of subsection (2) of this section.
>
> (2) No person shall be employed for a longer period than four (4) years. No person shall be employed at an institution where his relative serves on the board of regents for that institution.

Regardless of the language employed in KRS 164.360, the very next statute, KRS 164.365 gives "exclusive jurisdiction" over tenure decisions to the board of regents as follows:

> Anything in any statute of the Commonwealth to the contrary notwithstanding, the power over and control of appointments, qualifications, salaries and compensation payable out of the State Treasury or otherwise, promotions, and official relations of all employees of Eastern Kentucky University, Western Kentucky University, Murray State University, Northern Kentucky University, and Morehead State University, as provided in KRS 164.350 and 164.360, and of Kentucky State University, shall be under the exclusive jurisdiction of the respective governing boards of each of the institutions named.

We believe the board had plenary authority to offer Gale tenure in the Endowed Chair. Whatever the legislature intends by its limiting language in KRS 164.360, to give it the effect KSU wants would render meaningless every tenured position in the Commonwealth's universities.

Finally, KSU contends the trial court erred in construing the contract it prepared against it, a governmental entity. It relies on *Louisville & Jefferson County Metropoli-*

*tan Sewer Dist. v. St. Matthews Sanitary Ass'n.,* 307 Ky. 348, 208 S.W.2d 490, 491 (1948), which holds:

> The rule in construing contracts in which the government is a party is to resolve all ambiguities, presumptions and implications in its favor. "Where a public interest is affected an interpretation is preferred which favors the public." Am.Law.Inst. Restatement, Contracts, Vol. 1, Sec. 236(f).

As the appellee points out, there is a more prevalent rule of contract construction which requires an ambiguous contract to be construed against its preparer. It is this rule that the trial court utilized citing *Pulliam v. Wiggins,* Ky.App., 580 S.W.2d 228, 231 (1978).[3] The conflict in these two rules was not addressed in *Louisville & Jefferson County Metropolitan Sewer Dist., supra.* In fact, that opinion does not reveal which party drafted the contract.

We hold that the trial court utilized the appropriate rule of contract construction particularly as this controversy was not one affecting the public interest. The issue in the *Louisville & Jefferson County Metropolitan Sewer Dist.* case concerned the rights of the citizens of St. Matthews whose sewers had been connected to Louisville's drainage system. In other words, it was a matter of public import. In the instant case, the trial court was required to construe an employment contract of one individual. There was no public interest at stake. There was no reason to construe the contract in KSU's favor especially considering that the parties' intent was readily discernible from the contract's subject matter, the situation of the parties and the practices in the academic community. *See Whitlow v. Whitlow,* Ky., 267 S.W.2d 739 (1954).

Gale has filed a cross-appeal challenging the trial court's ruling which denied his request to admit into evidence a tape-recorded conversation that he had on August 21, 1990, with then president of KSU, Dr. John Wolfe, Jr. Dr. Wolfe, who was not aware the conversation was being recorded, told Gale that his research of endowed chairs verified

---

3. We cannot find where in the record the appellant alerted the trial court of the rule discussed in the *Louisville & Jefferson County Metropolitan Sewer Dist.* case. Apparently it is raising this issue for the first time in this appeal.

Gale's position that his tenure was in the chair. This evidence was merely cumulative of other evidence Gale introduced regarding the nature of endowed chairs in the university setting.

Considering our holding in the direct appeal, we believe any error in failing to admit evidence favorable to Gale is moot.

Accordingly, the judgment of the Franklin Circuit Court is affirmed in all respects.

GARDNER, J., concurs.

WILHOIT, J., concurs in result and files a separate opinion.

WILHOIT, Judge, concurring in result.

I concur in the specific holding by the majority that the appellant's contract was neither patently nor latently ambiguous and that it provided for tenure in the endowed chair. As to the rather thorough obiter dictum which follows, I am not in complete agreement. However, it is only obiter dictum.