689 A.2d 91

## The JOHNS HOPKINS UNIVERSITY

v.

## Samuel B. RITTER, et al.

### No. 259, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Nov. 4, 1996.

Reconsideration Denied in Part,
March 17, 1997.

Reconsideration Granted in Part,
March 17, 1997.

Joseph G. Finnerty, Jr. (William L. Reynolds, Tracey Gann Turner, Piper & Marbury L.L.P., Estelle A. Fishbein and Frederick G. Savage, on the brief), Baltimore, for appellant.

Marvin Ellin and Michael P. Smith (Ellin & Baker, on the brief), Baltimore, for appellees.

Martin Michaelson, Kathryn W. Bradley and Hogan & Hartson, L.L.P., Washington, DC (Sheldon E. Steinbach, General Counsel, of counsel), for amici curiae American Council on Educ., Georgetown University, Goucher College, New York University, St. Johns University, Tufts University, University of Maryland, University of Michigan, University of Pittsburgh and Washington College.

Argued before WILNER, C.J., MOYLAN, J., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

WILNER, Chief Judge.

On October 25, 1994, appellees, Samuel Ritter and Rebecca Snider, sued appellant, Johns Hopkins University, for breach of contract. They claimed that Hopkins had agreed to employ them as full professors of pediatric cardiology at the Hopkins Medical School, with tenure, effective January 1, 1994, and that it breached that agreement by discharging them as of December 31, 1994. Hopkins defended on the ground that the employment contract did not include a commitment to a full professorship and tenure and that, even if such a commitment had been made, the person negotiating the contract for Hopkins had no authority to make it.

After a fifteen-day trial in the Circuit Court for Baltimore City, the jury returned a verdict in favor of appellees in the aggregate amount of $822,844. In this appeal, Hopkins complains that the case should never have been submitted to the jury—that, as a matter of law, there was insufficient evidence to establish a contract promising a full professorship and tenure. For the reasons stated below, we shall reverse the decision of the circuit court.

### Introduction: Tenure

This case concerns "tenure," and it is therefore important to understand what is meant by that term. In education circles generally, and especially at the collegiate level, it denotes a

commitment by the school, as a direct or implied part of its faculty employment agreement, that, upon a determination that the faculty member has satisfied the conditions established by the school, the member's employment will be continuous, subject to termination only for adequate cause. Tenure is said to be "awarded" when, in accordance with its policies and procedures, the school determines that the conditions have been satisfied and the faculty member is entitled to the protected status.

Well over 90% of American colleges and universities, public and private, have a tenure system. It is a core part of the college-faculty relationship. Although most tenure systems are based, to some extent, on the 1940 Statement of Principles and Interpretive Comments developed by the Association of American Colleges and the American Association of University Professors, there is no uniform tenure system. There appears, rather, to be a significant variety in the particular plans used in the nation's colleges. As noted in *Faculty Tenure,* a Report and Recommendations by the Commission on Academic Tenure in Higher Education (1973), the 1940 statement was a statement of principles, "not a prescription of substantive institutional practice." *Id.* at 2–3. The authors observe:

"On every aspect of tenure, institutional policies and practices vary: definition of tenure; its legal basis; criteria for appointment, reappointment, and award of tenure; length of probationary period; categories of personnel eligible for tenure; relationship between tenure and rank; procedures for recommending appointments and awarding tenure; procedures for appeal from adverse decisions; procedures to be followed in dismissal cases; role of faculty, administration, students, and governing board in personnel actions; methods of evaluating teaching, scholarship, and public service; and retirement arrangements. In all these and many more, the range of variation among the 2600 institutions of higher education (and sometimes even within institutions—from division to division or even from department to department) is enormous."

Tenure may be afforded in a number of ways—by law, by contract, by moral commitment under an accepted academic code, or simply "by courtesy, kindness, timidity, or inertia." HANDBOOK OF COLLEGE AND UNIVERSITY ADMINISTRATION (ACADEMIC) 6–64 (Asa S. Knowles, ed., 1970). When provided by contract, its terms are usually stated in by-laws adopted by the school and published in a handbook. The Hopkins Medical School has a tenure system established by contract. Its terms are set forth in a document entitled *Policies and Guidelines Governing Appointments, Promotions, and Professional Activities Of The Full–Time Faculty Of The Johns Hopkins University School Of Medicine* (1972), commonly referred to, by those who have reason to refer to it, as the Gold Book.

The Gold Book does not mention tenure by name. It identifies the categories of faculty ranks, which, for our purposes, include Instructor, Assistant Professor, Associate Professor, and Professor, and sets forth the criteria and procedures for appointment, reappointment, and promotion to those ranks. Normally, a person progresses through the ranks, beginning with that of Instructor.

Instructors receive a one-year contract, renewable twice. Generally, an Instructor's contract is not extended beyond the third year; at the end of three years, the Instructor is evaluated and either recommended for promotion to Assistant Professor, let go, or, in special cases, retained for one more year. Assistant Professors receive contracts of from one to five years but are not retained in that rank for more than 10 years. They are evaluated after seven and nine years for possible promotion to Associate Professor. Associate Professors generally receive a three-year contract. They must be reviewed after six and nine years, with four possible options: promotion, but at the same rank, for three years; "contract to retirement," which is the Hopkins articulation of tenure; reappointment at rank, without promotion, for three years; or a terminal two-year contract.

There is a five-step process for appointment or promotion to the rank of full Professor. First, the Director of the Department reviews the candidate's credentials with the aid of a departmental or interdepartmental committee and forwards a recommendation to the dean. Second, the dean forwards a recommendation to the Professorial Promotions Committee, a committee appointed by the dean. That committee, as a third step, reviews the dean's recommendation and makes a recommendation to the Advisory Board of the Medical Faculty. The advisory board reviews the committee's recommendation and sends any favorable recommendation to the Board of Trustees of the University for approval. That is the fifth and final step. If the Board of Trustees approves, the dean notifies the candidate of his or her appointment/promotion.

### The Facts

The dispute here arises from an attempt by Hopkins to strengthen its division of pediatric cardiology which, according to appellees, had fallen into, at best, a state of mediocrity. Hopkins once had a first-class division of pediatric cardiology; it was founded by Dr. Helen Taussig. After her death in the 1980's, however, the division suffered a significant decline. According to Dr. Ritter, by 1992, Hopkins no longer had a "national presence" in that field—in clinical research, in the care of patients, or in the attracting and training of physicians.

Hopkins was especially behind in the use of echocardiography, a non-invasive procedure using sound waves to provide data about the structure of the heart and the severity of any heart defects. Although that procedure was widely used in other comparable institutions, Hopkins was deficient in it and, instead, relied primarily on cardiac catheterizations, which is an invasive procedure.

In an effort to correct this deficiency in capacity and service, the chief of pediatric cardiology was let go and Dr. Frank Oski, Director of the Department of Pediatrics, formed a search committee in January, 1993, to find a new chief.

At the time, Dr. Ritter was a tenured professor of pediatrics at Cornell University. He served as Chief of the Cornell Medical Center's Department of Pediatric Cardiology and was a recognized leader in the field of pediatric cardiology. Among other accomplishments, he had developed and perfected the field of transesophageal echocardiography and had lectured extensively throughout the country and around the world on pediatric cardiology.

Doctor Snider's credentials were equally impressive. When Hopkins began its search, she was serving as a tenured professor of pediatrics, with a subspecialty in cardiology, at Duke University. She had previously served as a tenured professor of pediatrics at the University of Michigan and had designed and built echocardiograph laboratories at both facilities. In addition to her contributions in the area of engineering echocardiograph equipment, she was recognized as an outstanding contributor to clinical research and an accomplished teacher on the subject of pediatric cardiology.

Drs. Ritter and Snider were married in January 1993 and thereafter began searching for an institution at which they both could teach. In February, 1993, when apprised of Hopkins' search, Dr. Ritter contacted Dr. Oski by letter and informed him of both his and Dr. Snider's interest in joining the Division of Pediatric Cardiology. On April 29, Ritter and Snider came to Baltimore at Hopkins' request and expense, and engaged in two days of extensive interviews with Dr. Oski and other members of the search committee and faculty. At the end of June, they returned for a second set of interviews, in the course of which, according to Dr. Ritter, Dr. Oski offered them both positions as professors of pediatrics.[1] Dr.

---

1. Dr. Snider seemed to imply in her testimony that the offer was made by Dr. Oski at the first interview in April. She stated:

"Dr. Oski told me that the situation was desperate, and especially since patients referrals were falling off rapidly and they were losing patients to the University of Maryland, and that he needed someone right away, that he was extremely desperate and he wanted us to start right away, but we couldn't relocate that fast, and we told him that

Ritter was to be Director of Pediatric Cardiology and the Helen Taussig Professor of Pediatrics and Dr. Snider was to be Director of Echocardiography. Following this second meeting and the offers made, Dr. Ritter resigned his position at Cornell, effective September 1, 1993, and engaged in a round of correspondence with Dr. Oski regarding the terms of the new positions. During July and August, several letters were exchanged.

In the first letter, of July 6, 1993, Dr. Ritter expressed his understanding that he and Dr. Snider would be "coming on board as full tenured professors of pediatrics in the university." The rest of the letter concerned a variety of matters, including the personnel, equipment, and space needed for the division and for the echocardiography laboratory.

Dr. Oski responded on July 21. His letter also covered a number of items, but of particular interest here is his statement:

> "You will be *proposed* for appointment as Professor of Pediatrics and be designated as the Helen Taussig Professor of Pediatric Cardiology. Dr. Snider will also be *proposed* for appointment as Professor of Pediatrics. Appointments at the rank of Professor carries tenure. *As I mentioned to you during our phone conversation, I cannot promise you the rank of Professor.* That must be decided by the Professors Appointment and Promotions Committee and approved by the Medical Advisory Board and the Dean. Your annual salary will be $150,000 plus fringe benefits, and the salary for Dr. Snider will be $135,000 plus fringe. These salaries are contingent on your appointments as Professors."

(Emphasis added.)

Hopkins asserts that Dr. Oski enclosed a copy of the Gold Book with his letter, but it appears that the book was not sent

---

the soonest that we could move to Baltimore and start work would be January 1st of '94."

The evidence generally suggests that any such offer would most likely have been made in June, rather than in April, but the discrepancy is not important at this stage of the proceeding.

until some time later.[2] Dr. Ritter responded to the July 21 letter on August 12, 1993, acknowledging the point made by Dr. Oski. He said:

> "I will be *proposed* for an appointment as Professor of Pediatrics and designated as the Helen Taussig Professor of Pediatric Cardiology. Dr. Snider will be *proposed* for appointment as Professor of Pediatrics. Appointment at the rank of Professor carries tenure. *We clearly understand that you cannot promise the rank of Professor: that must be decided by the Professors Appointment and Promotions Committee and approved by the Medical Advisory Board and the Dean.* ... The salaries [offered in the letter] are contingent upon appointments as professors."

(Emphasis added.)

The correspondence between Drs. Ritter and Oski dealt with more than the issue of tenure; indeed, most of it concerned other matters, such as space, equipment, supporting personnel, and budgets for the new operation. On August 31, 1993, Dr. Oski wrote to Dr. Ritter regarding these matters. In that letter, however, he again addressed the subject of faculty appointments. He confirmed that both Dr. Ritter and Dr. Snider would be "proposed" as Professors of Pediatrics and advised that the Professor's Appointment and Promotions Committee meets on a routine basis, "and therefore we will not have a definitive decision until they have reviewed your curricula vitae." The letter ended with Dr. Oski's effusive hope and expectation that Drs. Ritter and Snider would provide the leadership necessary to rebuild the Division of Pediatric Cardiology.

Drs. Ritter and Snider testified that, although they were well aware of the formal process for attaining professorial

---

2. Hopkins fails to support that statement with any citation to the record. Dr. Oski's letter does not, on its face, indicate that the Gold Book was enclosed. It appears from Dr. Ritter's testimony that the Gold Book was sent with a later letter, of August 31, 1993. It is not important whether the book was sent in July or August. Drs. Ritter and Snider were aware of its provisions before they finally accepted Hopkins' offer of employment.

rank and tenure, they were repeatedly assured by Dr. Oski that their appointments would be "rubber stamped" and would not be a problem. Dr. Snider said that, based on Dr. Oski's statements to her during the recruitment process "that there would be no problem at all with regard to my achieving full tenured professor at Hopkins," she resigned her tenured professorship at Duke and sold her home in North Carolina. Dr. Ritter was even more direct. He said that Dr. Oski "assured me that the procedure would simply be a rubber stamp and there would be no problem going through the process." That assurance must have come in July, 1993, for it was then that Dr. Ritter resigned his tenured position with Cornell.

Dr. Ritter said that he accepted Dr. Oski's assurances because he knew that Oski chaired the Professorial Promotions Committee. He and Dr. Snider were also relying on their own past experiences. Dr. Snider testified that, when she was recruited by Duke in 1992, which involved her resigning a tenured professorship at the University of Michigan, she was told by the chairman of the recruitment committee that he had shown her credentials to the chairman of the promotions committee, that there was no question that she would be awarded a full tenured professorship, that it was "just a matter of rubber-stamping to go through the committee," and that, on that basis, she accepted the offer. She said that, when recruiting tenured professors from other universities, as opposed to promotions through career tracks, that was the general procedure.

Dr. Ritter also asserted that this was the general practice around the country, at least with respect to the recruitment of pediatric cardiologists:

"The recruitment implies that one has the credentials to be recruited to such a position, and that, especially if one is recruited from a faculty position such as professor of pediatrics to another university as professor of pediatrics ... it needs to be presented formally, but the implication and universal acceptance amongst professors and heads of divisions is that this is essentially a done deal once the offer is

made, that it's simply a rubber stamp to go through the further committee work, and indeed, if it were otherwise . . . it would virtually stifle any kind of interchange between universities and the recruitment process."

To some extent, Dr. Ritter's view was confirmed by Dr. Douglas Moody, the head of pediatric cardiology at Cleveland Clinic. Dr. Moody testified that, because the applicant needs to make a decision about moving, the prospective institution negotiates with them "their position as they're coming into your institution." To be able to do that, he continued, the recruiter needs to have cleared the offer with the institution. "In other words," he said, "I don't go out and state to somebody that you're going to be a full professor, at least at the Cleveland Clinic, if I don't have the full agreement, as part of the negotiation process in that recruitment, that they come in as a full professor." Dr. Moody confirmed that the formal approval process can occur later, but that the result has been assured: "So it's done honorably between people in the negotiation process that you negotiate that honorably with the individual that you come in as . . . professor, because you have already told your institution, 'This is how it has to be,' and then in my experience they rubber-stamp that."

On September 13, 1993, the Administrator of Hopkins Children's Center, Edward Chambers, wrote to Drs. Ritter and Snider, confirming their employment "at the Professor level" and stating their agreed salaries. Two weeks later, in response to a request for employment verification from a mortgage lender, he confirmed their appointments as "Professor" and stated that the probability of continued employment was "Excellent." Dr. Oski advised Dr. Ritter to address himself professionally as "Professor" and allowed him to use the title "Professor of Pediatrics."

The formal appointment process began in October, 1993. On October 11, Dr. Oski wrote to Dean Michael Johns, formally proposing Dr. Ritter for appointment to the rank of Professor and enclosing a copy of his curriculum vita. On November 1, he sent a similar letter with respect to Dr. Snider.

Drs. Ritter and Snider started work at Hopkins on January 1, 1994, as agreed. By letter dated March 24, 1994, Dean Johns confirmed their 1993–94 faculty appointment as "Visiting Professor of Pediatrics." Dr. Snider was aware that the title "Visiting Professor" was often used for someone awaiting formal approval as a full Professor.

At some point not clear from the record, Dean Johns forwarded his favorable recommendations to the Professorial Promotions Committee, which then, through two investigative subcommittees, proceeded to review Dr. Ritter's and Dr. Snider's qualifications. On July 14, 1994, the subcommittee reviewing Dr. Snider's record presented to the full Committee its recommendation that she be appointed a full professor. The Committee immediately and unanimously endorsed that recommendation. On July 26, the subcommittee investigating Dr. Ritter's qualifications similarly recommended his appointment as full professor. The full committee was not scheduled to meet again until the fall, however, so no action was taken.

Unfortunately, even as the professorial appointment process was proceeding, the relationship between Drs. Ritter and Snider, on the one hand, and other professional personnel in the cardiology unit at Hopkins was not progressing as had been anticipated. The reasons for the growing dissension were very much in dispute. One problem, it appears, was that Dr. Oski, the main force in bringing Ritter and Snider to Hopkins, was required to take a period of medical leave and was therefore unavailable to monitor the rift that began to develop between them and most of the rest of the faculty and clinical staff.

According to the plaintiffs, some of the promises made by Hopkins with respect to the resources that would be allocated to the division were simply not kept. The space allocated for the new echocardiography lab was not satisfactory to Drs. Ritter and Snider. The rooms were very small, poorly ventilated, and had inadequate climate controls. The equipment in the laboratory often overloaded the electrical circuits. In

vain, Dr. Snider sent numerous letters to persons in the University administration.

Other professionals at Hopkins saw the matter differently; they viewed Drs. Ritter and Snider as creating more problems than they were solving in the Division of Pediatric Cardiology. Various members of the staff complained to the Vice Dean for Faculty Affairs, Dr. Catherine DeAngelis. Some of the complaints had to do with Ritter's and Snider's inability to get along with their colleagues and staff, but they extended beyond that. In September, 1994, the Director of Pediatric Cardiac Surgery complained to the Cardiac Surgeon–in–Chief that "in nine months they have alienated most of the physicians and administrators from whom they need support to succeed." He also noted that "[c]linical referrals to the division are down drastically (including referrals for echocardiograms), morale among the faculty is poor, vital staff have resigned, and surgical volume is decreasing." Specific examples were given.

As a result of that letter, Dean Johns convened a meeting on October 7, 1994, at which these and other complaints of a similar nature were made by seven other colleagues. In a letter to Dr. Oski of October 13, 1994, Jean Kan, Professor of Pediatrics and a pediatric cardiologist, complained of Dr. Ritter's inability to establish outreach programs, his poor management, his failure to pay attention to research projects of the junior faculty and fellows, and some of his medical decisions.

Based upon this information, Dean Johns concluded that Ritter's and Snider's employment should be ended. At that point, the issue of Dr. Ritter's appointment as full Professor, with tenure, was still before the Professorial Promotions Committee. Dr. Snider's appointment had been approved by that committee but not by the Advisory Board of the Medical Faculty and not by the Board of Trustees.

On October 18, 1994, Dr. Oski, who had recently returned to work, informed Drs. Ritter and Snider that they would not be rehired after December 31, 1994. This lawsuit was then filed.

Immediately prior to trial, the court considered a motion for summary judgment filed by Hopkins and other defendants who had been sued. The court granted the motion as to all claims except the two for breach of contract against Hopkins, and the case proceeded on those two counts. Further motions for judgment made by Hopkins at the end of the plaintiffs' case and at the end of the entire case, were denied, apparently upon a finding by the court that the correspondence between the parties in July and August, 1993 may not have constituted the entire contract.[3] In returning special verdicts, the jury found that (1) Drs. Ritter and Snider were not at-will employees, (2) Hopkins had offered and Ritter and Snider had accepted contracts for tenured professorships, and (3) Hopkins did not have just cause to terminate their employment.

### *Discussion*

#### *Scope of Review*

In its brief, Hopkins complains about the denial of both its motion for summary judgment and its motions for judgment made during the trial. In both instances, its argument is that the granting of tenure is governed exclusively by the five-step procedure set forth in the Gold Book, that Drs. Ritter and Snider knew that to be the case, that they never completed that process, that neither Dr. Oski nor anyone else had any authority to waive or alter the process, and that, accordingly, the plaintiffs failed, as a matter of law, to establish a right to tenure or the breach of any contract providing for tenure.

There is some difference in the scope of our review of the denial of a motion for summary judgment and the denial of a motion for judgment made at trial. The court's decision to deny summary judgment, of course, has to be viewed in the light of the documents before the court at the summary judgment proceeding. Notwithstanding the wording of Md.

---

3. If any written motions for judgment were filed during the trial, they were not included in the record extract. None of the argument on any such motions was recorded. We therefore have no idea of what points were argued by Hopkins or of the court's precise reasoning.

Rule 2–501(e), a trial court has at least a limited amount of discretion to deny a motion for summary judgment, even if it could properly have granted the motion, in order to allow the parties to develop the facts in greater detail, including at a trial. *Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 415 A.2d 582 (1980); *Foy v. Prudential Ins. Co.,* 316 Md. 418, 559 A.2d 371 (1989); *cf. Decoster v. Westinghouse,* 333 Md. 245, 634 A.2d 1330 (1994). It follows, then, that although the denial of summary judgment is reviewable on appeal, even after a verdict is rendered for the non-moving party, *Melbourne v. Griffith,* 263 Md. 486, 283 A.2d 363 (1971), appellate courts ordinarily are averse to overturning a judgment on the merits in favor of the party opposing summary judgment on the ground that summary judgment should have been granted. *Presbyterian Hosp. v. Wilson,* 337 Md. 541, 547, 654 A.2d 1324 (1995).

■ The principal issues before the court in this action were the nature of the contract between the parties and the authority of Dr. Oski to waive or alter the tenure process set forth in the Gold Book. The thrust of the plaintiffs' case was that the terms of their contracts emanated not just from the letters between Dr. Ritter and Dr. Oski but also from commitments made during oral conversations. It was not an abuse of discretion for the court to allow that aspect of the case to be developed by evidence.

The issue with respect to the denial of a motion for judgment made at the end of trial is purely one of law. The question is simply whether, under applicable law, the evidence was legally sufficient to present a triable issue. If there is any competent evidence, however slight, supporting the plaintiff's right to recover, the motion must be denied. Only if the evidence, viewed in a light most favorable to the party resisting the motion, is legally insufficient to permit a recovery may the motion be granted. *I.O.A. Leasing Corp. v. Merle Thomas Corp.,* 260 Md. 243, 248–49, 272 A.2d 1 (1971); *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A.2d 53 (1961). That is the framework of our analysis.

## The Nature Of The Contract

■ Hopkins has asserted throughout that the contract between the parties was embodied exclusively in the exchange of letters between Drs. Ritter and Oski in July and August, 1993 and, in particular, Dr. Oski's letter of August 31. Those letters, it urges, demonstrate conclusively that no offer of tenure was made. They establish beyond legitimate dispute that the suggestion by Dr. Ritter in his letter of July 6, 1993 that he and Dr. Snider would be starting as full tenured Professors was promptly and unambiguously rejected, and that they understood thereafter that they would need to complete the process established in the Gold Book.

The plaintiffs, on the other hand, assert that, based on oral conversations with Dr. Oski and based on general practice within the academic community when persons of their stature are recruited, the agreed arrangement was that the Gold Book process was a mere formality. It would be followed; the bases would be touched; but the end result was assured. In their words, it would all be "rubber stamped." Tenure was promised, along with the method of achieving it.[4]

---

4. Although Hopkins complained below about the court admitting this parol evidence, it has not adequately carried that complaint to this Court. The brief states one Question Presented: whether the court erred in denying Hopkins' motions for judgment "where there was no evidence at summary judgment or at trial to support the jury's finding that the Plaintiffs were tenured Professors at Hopkins." Its principal argument is that the court erred in failing to rule as a matter of law that plaintiffs were at-will employees who never received tenured appointments. That argument is divided into three parts, one of which is that the plaintiffs offered no proof that they had tenure. That subsidiary argument is, itself, subdivided into four parts, one of which is captioned "Plaintiffs' Efforts To Prove That They Had Tenure." That, in turn, is subdivided into two arguments, one of which is titled "Oski's 'Assurances.'" "Oski's 'Assurances'" is further subdivided into two parts, one of which is that "the letters between the parties were an integrated agreement on the tenure issue and could not be varied by parol evidence."

That manner of presentation leaves a great deal to be desired. The question presented and the argument following it are couched as a failure of the plaintiffs to offer proof of tenure. It is impermissible to bury, in a part of a part of a part of a part of an argument, an entirely independent evidentiary issue. We shall not address it.

Notwithstanding Hopkins' assertion to the contrary, in recounting the conversations they had with Mr. Oski, the plaintiffs did present evidence that the contract was not embodied solely in the exchange of letters but arose as well from those conversations with Dr. Oski. From that evidence, the jury could properly find, as it did, that, in the recruitment process, Dr. Oski promised the plaintiffs that they would be employed as full Professors, that they would initially be given the interim title of Visiting Professor, that the formal process for approving their appointments as full Professors would be started promptly, and that the end result was assured.

On this record, then, the issue is not whether the evidence sufficed to support the plaintiffs' view of what was promised by Dr. Oski but whether, as a matter of law, Dr. Oski had the authority to promise what they claim he promised.

### Dr. Oski's Authority

■ There is no dispute that Dr. Oski was authorized by Hopkins to recruit and negotiate with Drs. Ritter and Snider. The question is whether he was authorized to bind Hopkins to an assurance of tenure, in particular that the procedures set forth in the Gold Book would be treated as mere formalities.

It is evident from our earlier discussion that tenure is a serious matter for both the college and the faculty. From the faculty member's point of view, it is a bankable assurance of continued employment until retirement age and thus a critical cushion for the exercise of academic freedom. It affords a measure of protection against economic retaliation for investigating and publishing controversial or unpopular material, as

---

We observe, however, that, had we addressed the issue, we would have found no error in the admission of the plaintiffs' testimony concerning the conversations they had with Dr. Oski. The parol evidence rule bars extraneous evidence that would vary or contradict the terms of a complete and fully integrated written contract. *Higgins v. Barnes*, 310 Md. 532, 530 A.2d 724 (1987). None of the letters relied on by Hopkins purport to be a complete and fully integrated contract. The one most relied on—the letter of August 31, 1993—is not even signed by the plaintiffs. Dr. Oski himself admitted having a number of conversations with Dr. Ritter regarding the terms of their employment.

diligent scholars must often do in order to expand the realm and depth of human knowledge.

The awarding of tenure is also critical to the college, to some extent for the converse of the reason it is important to the faculty. It binds the college to a commitment of continuous employment, however poor the faculty member's teaching, research, or administrative skills may become and however much controversy or embarrassment the faculty member may later bring upon the college because of his or her academic conduct or pronouncements. *See Faculty Tenure, supra; Mayberry v. Dees,* 663 F.2d 502 (4th Cir.1981); *Beitzell v. Jeffrey,* 643 F.2d 870, 875 (1st Cir.1981). Perhaps for that reason, it is generally reserved for only the higher faculty ranks and is granted only after a multi-step process designed to assure that the applicant is academically, personally, and temperamentally qualified to be placed in that protected status. It is noteworthy as well that the review process ordinarily involves persons other than those who recruited the faculty member, thereby assuring an objective and more detached examination of the candidate's qualifications. At Hopkins, it was regarded as sufficiently important to require ultimate approval by the Board of Trustees—the highest governing body of the University.

There is nothing in this record—no evidence whatever—that the Board of Trustees or the Advisory Board of the Medical Faculty ever authorized Dr. Oski to make a commitment on their behalf or even that Dr. Oski had ever sought such authority or discussed the matter with either body. Unlike the situation recited by Dr. Moody, therefore, or the experience recounted by Dr. Snider in her recruitment by Duke, this matter had not been "cleared" in advance with the bodies whose approval was needed. Although Dr. Oski may reasonably have believed that persons of the stature of Drs. Ritter and Snider would have no trouble winning the necessary approvals, there is no indication that the Advisory Board or the Board of Trustees ever led him to believe that they felt the same way.

 What, then, was the source of Dr. Oski's authority to bind the Advisory Board or the Board of Trustees to a "rubber stamp" procedure, to an abdication of their duties to make an objective and reasonable investigation and to exercise their honest judgment? It surely cannot be any notion of apparent authority. Apparent authority exists when the words or conduct of *the principal* cause the third party to believe that the principal consents to or has authorized the conduct of the agent. *Parker v. Junior Press Printing Service, Inc.,* 266 Md. 721, 727–28, 296 A.2d 377 (1972). As noted, there were no such words or conduct by anyone other than Dr. Oski in this case. There is no evidence that anyone at Hopkins in rank above Dr. Oski had even met Drs. Ritter and Snider or were aware of the negotiations prior to their conclusion, much less said or did anything to lead them to believe that Dr. Oski was authorized to promise tenure.

 Nor does the related doctrine of agency by estoppel provide any succor. Like apparent authority, an agency by estoppel can arise only where the principal, through words or conduct, represents that the agent has authority to act and the third party *reasonably* relies on those representations. *Reserve Ins. Co. v. Duckett,* 240 Md. 591, 600, 214 A.2d 754 (1965); *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 643–45, 370 A.2d 554 (1977); *Medical Mut. Liab. v. Mutual Fire,* 37 Md.App. 706, 379 A.2d 739, *cert. denied,* 282 Md. 736 (1978). Reasonable reliance is a critical element. In light of the written correspondence between Drs. Ritter and Oski on this very issue and the lack of any representation—written, oral, or by conduct—on the part of anyone on the Advisory Board or the Board of Trustees that the established written procedure for obtaining tenure would or could be effectively waived, it was clearly not reasonable, as a matter of law, for Drs. Ritter or Snider to believe that Dr. Oski had any authority whatever to bind Hopkins to a promise of tenure.

Our conclusion, that Dr. Oski had no authority to make an effective commitment of tenure and that Drs. Ritter and Snider had no basis for believing that he did is in accord with

the conclusions reached by other courts in similar kinds of cases. The prevailing rule is that, when a tenure process is established in writing and is communicated to a prospective appointee, a subordinate official may not circumvent that process and bind the college to a tenure arrangement. *See Davis v. Oregon State University,* 591 F.2d 493 (9th Cir.1978); *Cohen v. Board of Trustees of Univ. of Medicine,* 867 F.2d 1455 (3d Cir.1989); *Gottlieb v. Tulane University of Louisiana,* 529 So.2d 128 (La.Ct.App.1988).

There are cases in which, based on the terms offered to them, faculty members have been held to have a legitimate expectation of continued employment, or a right to tenure, or a right to a longer contract than ordinarily would be allowed. Those cases are distinguishable on their facts, however, and none of them support the proposition that a subordinate official can effectively confer or contractually assure tenure in the face of clear, written procedures precluding such a commitment. *See, for example, Harris v. Arizona Board of Regents,* 528 F.Supp. 987 (D.Ariz.1981) (finding, in the context of an action under 42 U.S.C. § 1983 and under the circumstances in that case, that the dean had apparent authority to offer tenure to the plaintiff); *University of Arizona v. County of Pima,* 150 Ariz. 184, 722 P.2d 352 (Ct.App.1986) (through its athletic director, college effectively offered coach a four-year, rather than a one-year, contract); *Bd. of Regents of Univ. v. Gale,* 898 S.W.2d 517 (Ky.Ct.App.1995) (holding that undisputed grant of tenure applied to a particular endowed chair rather than a faculty position generally); *Lewis v. Loyola University of Chicago,* 149 Ill.App.3d 88, 102 Ill.Dec. 425, 500 N.E.2d 47 (1986) (finding that, had dean submitted recommendation of plaintiff for tenure, as promised, tenure would have been granted).

The closest that a court has come to recognizing a form of *de facto* tenure is *Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347 (6th Cir.1975), in which, based on oral discussions, the Court held that a faculty member, for purposes of § 1983, had "a cognizable property interest in the form of a reasonable expectation of future and continued

employment," notwithstanding a formal tenure system. The Court construed *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), as allowing such a finding even in the face of an explicit tenure system. We note, first, that the case before us is strictly a breach of contract case, not a § 1983 action. More important, we do not read *Perry v. Sindermann* as the Sixth Circuit Court did; nor did the Ninth Circuit Court of Appeals in *Haimowitz v. University of Nevada,* 579 F.2d 526 (9th Cir.1978). The *Haimowitz* Court noted, at 529, "[t]hat the circumstances in *Soni* were singularly unique is borne out by the fact that it is the only case of its type. Faced with similar *de facto* tenure claims, subsequent cases have consistently distinguished *Soni* and refused to extend its application."

If, as Drs. Ritter and Snider argue, the normal tenure process does not work when it comes to recruiting such distinguished and proven scholars as they, and if, as a result, Hopkins will find itself unable to attract persons of their quality, Hopkins may find it necessary to amend its Gold Book procedures to allow for a "quick track rubber stamp" procedure. It has not yet done so, however. On this record, we conclude that Dr. Oski had no authority to bind Hopkins to the kind of commitment the jury apparently found he made and that Drs. Ritter and Snider had no reasonable basis for believing that he had such authority. Accordingly, the court erred in denying Hopkins' motion for judgment and submitting the case to the jury.

JUDGMENT REVERSED; APPELLEES TO PAY THE COSTS.