**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

INTEGRATED CONSULTING SERVICES,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.

LDDS COMMUNICATIONS,
INCORPORATED GA, a Georgia
Corporation,
<u>Defendant-Appellee.</u>

No. 98-1277

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-95-1707-AW)

Argued: January 29, 1999

Decided: April 15, 1999

Before WILKINSON, Chief Judge, and LUTTIG and
TRAXLER, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Traxler wrote the opinion,
in which Chief Judge Wilkinson and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Sheldon Neal Jacobs, SNYDER, WEINER, WELT-
CHEK, VOGELSTEIN & BROWN, Baltimore, Maryland, for Appel-
lant. David Graham Leitch, HOGAN & HARTSON, L.L.P.,

Washington, D.C., for Appellee. **ON BRIEF:** Stephen L. Snyder, Arnold M. Weiner, SNYDER, WEINER, WELTCHEK, VOGEL-STEIN & BROWN, Baltimore, Maryland, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

TRAXLER, Circuit Judge:

This case concerns the relationship between three companies that are involved to varying degrees in the provision of long-distance telephone service. LDDS Communications, Inc. ("LDDS"), one of the largest long-distance carriers in the United States, markets its service to potential customers through an in-house sales force and also through independent contractors. The independent contractors, which produce only a small percentage of business for LDDS, solicit customers for LDDS' long-distance service and pay their own expenses. In return, LDDS pays these independent contractors a percentage of revenues acquired from customers they enroll.

In 1992, Net-Tel Management Group ("Net-Tel") signed a representation agreement ("LDDS/Net-Tel Agreement") to operate as an independent contractor with LDDS. Thereafter, Net-Tel signed a separate agreement with Integrated Consulting Services, Inc. ("Integrated") under which Integrated agreed to solicit long-distance customers through advertisements on cable television. When the venture between Net-Tel and Integrated failed, Integrated decided to forego an action against Net-Tel and instead brought the present action against LDDS.[1]

Integrated now appeals from the district court's order granting

_____

[1] Integrated's decision not to sue Net-Tel was undoubtedly due to Net-Tel's shaky financial status.

2

summary judgment in favor of LDDS on Integrated's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. For the reasons set forth below, we affirm.

I.

To assess the claims Integrated makes against LDDS, the court reviews the contracts by which the parties expressed their obligations, as well as the surrounding circumstances. At the outset, we note that LDDS conferred very limited authority upon companies that solicited business for it so as to avoid the creation of agency relationships. In its contract with Net-Tel, for example, LDDS included language which clearly established that Net-Tel would operate as an independent contractor:

> You [Net-Tel] understand that you are an <u>independent contractor</u> and not an employee of [LDDS] under this Agreement. We are interested only in the orders for our services that you obtain. <u>You will have total control of the management of your business subject to the limitations contained in this Agreement</u>. We will not require you to do anything that would jeopardize your status as an independent contractor under this Agreement. <u>You may not, however, enter into any agreement on behalf of [LDDS] or otherwise obligate [LDDS] without [LDDS's] prior written approval</u>.

J.A. 396 (emphasis added). Additionally, LDDS held no management control over Net-Tel, which was explicitly prohibited from using LDDS' trade name or service marks without written approval from LDDS.

Thus, the scope of Net-Tel's authority was prescribed in 1993 by the LDDS/Net-Tel Agreement when Integrated -- a small business concern managed by Erwin Aguayo ("Aguayo") and Robert Post ("Post")-- expressed interest in signing an agreement with Net-Tel. Aguayo approached Michael Clifford ("Clifford"), Net-Tel's President, with an "innovative" idea of marketing LDDS' long-distance service via cable television. Although Clifford told Aguayo that he

3

had express authority to act on LDDS' behalf, Integrated never verified this with LDDS.

On October 23, 1993, after a period of negotiations, Integrated signed an agreement with Net-Tel entitled "Master Independent Distributor" Agreement, a standard agreement that Net-Tel used with all of its distributors. J.A. 403. The agreement set forth Integrated's role as an independent contractor for Net-Tel and explained that Net-Tel's only obligation was to remit to Integrated a percentage of revenue for all sales generated by Integrated. LDDS was not mentioned in the agreement.

The Master Independent Distributor Agreement was replaced on October 28, 1993 by the Master Corporate Distributor Agreement ("MCD Agreement"), which was drafted by Integrated. Under this Agreement, Integrated agreed to develop and implement a plan to market LDDS' long-distance service to cable television subscribers. In return, Net-Tel promised to pay Integrated commissions for long-distance sales generated by Integrated out of commissions Net-Tel received from LDDS.

The MCD Agreement was signed only by representatives of Net-Tel and Integrated, but incorrectly represented that"Net-Tel [wa]s the agent of [LDDS]," J.A. 404, and that "[LDDS ha[d] authorized Net-Tel to enter into independent distributor agreements with third parties, for the marketing and sales of [LDDS'] telephone services." Id. Neither Net-Tel nor Integrated notified LDDS of the MCD Agreement's existence.

After executing the MCD Agreement, Aguayo and Post prepared a separate agreement, the Cable Affiliate Agreement, which was merely a written proposal summarizing Integrated's suggested strategy of marketing through cable television. The Cable Affiliate Agreement contained no language, either explicit or implicit, purporting to create a contractual relationship between Integrated and LDDS. But, Aguayo planned to "review [the Cable Affiliate Agreement] with the executives of LDDS to get their blessing." J.A. 91.

Aguayo presented the Cable Affiliate Agreement to LDDS on November 16, 1993 -- nearly one month after Integrated and Net-Tel

4

executed the MCD Agreement -- when Aguayo met with LDDS officials for the first time. This meeting was planned by Net-Tel's Clifford, who attended along with Net-Tel's Roger Depew ("Depew") and Mark Brownski ("Brownski"), Integrated's Aguayo, and LDDS' Vice-President H. Tresvant Moore ("Moore"), and Manager of Marketing Programs George Hampton ("Hampton"). The greater portion of the meeting consisted of Aguayo's verbal effort to solicit LDDS' participation in Integrated's proposed marketing scheme reflected by the Cable Affiliate Agreement. The MCD Agreement, however, was not mentioned and LDDS remained unaware that it existed at the time.

After considering Integrated's proposal, Hampton informed Aguayo that LDDS had attempted such a program in the past and it had failed. Hampton then wished Aguayo the best of luck in the event that he pursued the program "exclusively" with Net-Tel, but declined to obligate LDDS in any way.

Following the November 16, 1993 meeting, Integrated proceeded to develop a marketing plan and claims to have spent thousands of dollars in furtherance of the MCD Agreement. Integrated sent a copy of the plan to Net-Tel, but not to LDDS. Although Net-Tel later forwarded this plan to LDDS, the plan contained no specific reference to the MCD Agreement and, for all practical purposes, was administered exclusively between Integrated and Net-Tel. Integrated maintained minimal and sporadic discourse with Margaret Harrington, Hampton's assistant at LDDS, but these conversations likewise included no specific reference to the MCD Agreement or to any contractual relationship allegedly existing between Integrated and LDDS.

In March 1994, Integrated's relationship with Net-Tel soured over production costs for television advertisements. Integrated alleged that Net-Tel refused to provide "[m]arketing assistance in the form of pre-recorded television advertising spots," J.A. 405, as required under the MCD Agreement. Integrated also asserted that Net-Tel breached the MCD Agreement in other ways. In a last ditch effort to salvage its relationship with Net-Tel, Integrated attempted to renegotiate the terms of the MCD Agreement. This attempt, however, was unsuccessful.

5

In April of 1994, Integrated sought to establish a relationship directly with LDDS by placing telephone calls to Moore and Hampton. This marked the first direct contact Integrated had with either Hampton or Moore since the November 16, 1993 meeting. Integrated forwarded a copy of the MCD Agreement to LDDS on April 7, 1994, which was the first time LDDS was made aware of its existence. On the same day, Hampton advised Clifford that Net-Tel was not authorized to use LDDS' name in the MCD Agreement, or any other agreement, without LDDS' written permission.

Integrated's efforts to reach an agreement with LDDS intensified when Aguayo sent a letter to Hampton requesting to deal "directly with [LDDS] as opposed to [the] existing agreement with Net-Tel." J.A. 422. No such agreement was ever reached, however, and Net-Tel was ultimately prompted to terminate the MCD Agreement on April 15, 1994. On the following day, Hampton advised Aguayo in writing that "[t]here [was] no existing Representation Agreement . . . between LDDS and [Integrated]." J.A. 426.

At all times between the MCD Agreement's negotiation and termination, Integrated had the express right to review the underlying LDDS/Net-Tel Agreement.[2] The LDDS/Net-Tel Agreement expressly forbade Net-Tel from reaching any agreement purporting to bind LDDS. Indeed, Integrated concedes that had it reviewed the LDDS/Net-Tel Agreement, it would not have entered into the MCD Agreement with Net-Tel. Nevertheless, Integrated neglected such review.

Claiming to have lost substantial sums of money in its venture with Net-Tel, Integrated initiated this lawsuit against LDDS for breach of the MCD Agreement and for breach of the implied covenant of good faith and fair dealing. Integrated asserted that LDDS could be held responsible for the obligations of Net-Tel based upon principles of agency, ratification, apparent agency, and estoppel.

_____

[2] The MCD Agreement provided at Paragraph 6 that, "Net-Tel agrees that [Integrated] may examine copies of its contracts with LDDS." J.A. 220.

6

II.

This case presents the issue of whether LDDS may be held liable to Integrated for breach of contract or breach of the implied covenant of good faith and fair dealing resulting from its own conduct or that of Net-Tel. We conclude, upon de novo review, that LDDS is not liable as a matter of law.

A.

We first address Integrated's allegation that Net-Tel was LDDS' agent and thus, Integrated effectively contracted with LDDS when it contracted with Net-Tel. Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). The existence of an agency relationship in fact -- actual authority -- may be established "by written agreement or by inference." Patten v. Bd. of Liquor , 667 A.2d 940, 947 (Md. Ct. Spec. App. 1995). By either mechanism, however, Integrated bears the burden of coming forward with reliable evidence supporting Net-Tel's authority to bind LDDS to third party agreements, such as the MCD Agreement. See Homa v. Friendly Mobile Manor, 612 A.2d 322, 333 (Md. Ct. Spec. App. 1992). We conclude that Integrated cannot meet this burden.

1.

Primarily, there is no written agreement granting Net-Tel actual authority to act on LDDS' behalf as an agent. To the contrary, the LDDS/Net-Tel Agreement expressly withheld such authority, providing that "[Net-Tel] may not . . . enter into any agreement on behalf of [LDDS] or otherwise obligate [LDDS] without [LDDS'] prior written approval." J.A. 396.

Moreover, the LDDS/Net-Tel Agreement expressly provides that Net-Tel is an independent contractor. Although an independent contractor can be an agent, a written contract on the subject is conclusive absent other evidence of agency or course of dealing. See State

7

Comm. on Human Relations v. Suburban Hospital, Inc., 686 A.2d 706, 717 n.6 (Md. Ct. Spec. App. 1996); Cerniglia v. Pretty, 674 F. Supp. 1167, 1171 (D. Md. 1987). Thus, Integrated cannot establish Net-Tel's agency by written agreement.

2.

Integrated's attempt to establish Net-Tel's agency by inference also fails. To establish an agency relationship by inference, it must be shown that (1) the agent was subject to the principal's right of control; (2) the agent had a duty to act primarily for the benefit of the principal; and (3) the agent held the power to alter legal relations of the principal. Schear v. Hotel Management Corp., 487 A.2d 1240, 1248 (Md. Ct. Spec. App. 1985). The relationship between Net-Tel and LDDS does not involve circumstances suggesting that an agency relationship had been established by inference.

At the outset, we note Integrated's obvious inability to satisfy the third element as Net-Tel held no power "to alter the legal relations of [LDDS]." Id. Agency is a product of agreement, and "[r]eciprocal duties between the parties together with a power of the agent to bind the principal are normally created at the time of the agreement." Restatement (Second) of Agency § 1, 10 (1958) (emphasis added). But the LDDS/Net-Tel Agreement forbade Net-Tel from legally binding LDDS. This fact is fatal to Net-Tel's claim of agency by implication. See id.

In addition, LDDS did not retain sufficient "control" over Net-Tel so as to create an agency by inference. For example, under the LDDS/Net-Tel Agreement, LDDS did not prescribe the manner or means by which Net-Tel generated business. Net-Tel was authorized to engage its own agents, but LDDS played no role in selecting these agents, did not negotiate agreements with them, and transacted no direct business with them. Further, under the Agreement, Net-Tel lacked the authority to compel LDDS to accept customers recruited by Net-Tel.

Traditional indicia of control lacking, nothing suggests that the relationship between Net-Tel and LDDS was, in fact, any different than that described by the Agreement. That relationship was one

8

whereby Net-Tel served LDDS as an independent contractor, without binding authority commonly associated with agency. Patten, 667 A.2d at 947 ("An agency relationship is not simply an employer/employee or contractor/subcontractor relationship. . . . [N]ot every fiduciary relationship automatically equates to an agency relationship.").

This is not to say, of course, that no benefit enured to LDDS when Net-Tel procured customers for LDDS. Indeed, Net-Tel's compensation from LDDS was linked to its performance of subsidiary duties in procuring long-distance customers. "But the fact that one of the parties has subsidiary duties to act for the interests of another, as where a [seller] of [services for a service provider] agrees that he will advance the interests of the [service provider] in certain respects, does not create an agency relation[ship] with respect to the sale[s]." Schear, 487 A.2d at 1249 (internal quotation marks and citation omitted). Indeed, "[i]t is the element of continuous subjection to the will of the principal which distinguishes the . . . agency agreement from other [more liberal] agreements," id . at 1248-49 (internal quotation marks and citation omitted), such as the LDDS/Net-Tel Agreement.

In support of its argument that an agency relationship existed between Net-Tel and LDDS, Integrated relies on statements of a Net-Tel representative that Net-Tel was LDDS' "number one agent," J.A. 75, as well as contractual language in the MCD Agreement declaring that "Net-Tel [wa]s an agent of [LDDS]" and that LDDS "ha[d] authorized Net-Tel to enter into independent distributor agreements with third parties, for the marketing and sales of[LDDS'] telephone service." J.A. 404. Net-Tel's statements alone, however, cannot establish the existence of an agency relationship. "From the well-established tenet that an agent cannot create his own authority to represent a principal, it follows that an agent's statements that he has such authority cannot, without more, entitle a third party to rely on his agency." Auvil v. Grafton Homes, Inc., 92 F.3d 226, 230 (4th Cir. 1996). See also Restatement (Second) of Agency §§ 7-8 (1957). Instead, "[t]he authority of an agent must come from the principal," Homa, 612 A.2d at 333, and, to be actionable, must underlie the precise activity of which the injured party complains, see id.

In the present matter, LDDS granted no authority conferring agency status upon Net-Tel. Instead, LDDS expressly withheld such

9

status as beyond the scope of Net-Tel's authority under the LDDS/Net Tel Agreement, and Integrated has come forward with no evidence which would support its claim that Net-Tel was an agent. To be clear, Net-Tel's own proclamations of agency status do not support the existence of an agency relationship. Whether a particular relationship is an agency depends on the relations of the parties as they in fact exist, without regard to what they call their relationship. A mere proclamation of agency is not enough. Thus, we find Integrated's agency by inference claim to be deficient as a matter of law.

B.

Integrated next contends that LDDS ratified the MCD Agreement thereby subjecting itself to liability. "Ratification is the affirmance by a [principal] of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by [the principal]." Restatement (Second) of Agency § 82 (1958). The theory is not dependent on authority underlying the agent's actions, but, conversely, has effect where the "[i]ntention to ratify may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized  act." Progressive Casualty Ins. v. Ehrhardt, 518 A.2d 151, 156 (Md. Ct. Spec. App. 1986) (emphasis added). In other words, even "[w]hen the [alleged] agent has no authority to do an act, the principal may later ratify the act, giving it the same effect as if it had been originally authorized." Citizens Bank of Maryland v. Maryland Indus. Finishing Co., 659 A.2d 313, 320 n.9 (Md. 1995).

Integrated argues that LDDS, by words, conduct, and/or silence, bestowed its approval upon the disputed MCD Agreement and, consequently, ratified it. We are not persuaded by Integrated's arguments in this regard. Indeed, LDDS could not have ratified the MCD Agreement for two reasons: (1) Net-Tel did not execute the MCD Agreement on LDDS' behalf; and (2) LDDS was unaware of the MCD Agreement's existence at all relevant times when ratification could have occurred.

1.

Principally, Integrated's failure to prove that the MCD Agreement was executed on LDDS' behalf is crucial because "ratification . . .

10

presupposes that the act complained of was . . . on behalf of the principal." Hammond v. DuBois, 101 A. 612, 623 (Md. 1917). The record is replete with evidence revealing that the MCD Agreement was not executed on LDDS' behalf. Net-Tel's Clifford testified that he believed the MCD Agreement to be between Net-Tel and Integrated, rather than between LDDS and Integrated. Thus, even Net-Tel did not execute the MCD Agreement with the intent to bind LDDS. Other evidence also suggests the absence of any such intent when the Agreement was executed. It is undisputed that LDDS did not participate in the MCD Agreement's negotiation, that Integrated had no interaction with LDDS whatsoever prior to or during the MCD Agreement's execution, and that the MCD Agreement was explicitly between Net-Tel and Integrated only. There is simply no evidence that LDDS ratified the MCD Agreement, which was consummated solely by the acts of Integrated and Net-Tel in their respective individual capacities and for their own benefit.

2.

Integrated's ratification argument also fails because LDDS had no knowledge of the Agreement's existence and no intent to ratify it. In order to ratify the MCD Agreement, LDDS must have had "an intention to ratify, and knowledge of all material facts," Ehrhardt, 518 A.2d at 156 (internal citations omitted), one of obvious import being the Agreement's existence. Plainly stated, LDDS' knowledge of the MCD Agreement's existence, at the relevant times alleged as ratifying moments, was a condition precedent to its ratification. See Lee v. Pfeifer, 916 F. Supp. 501, 508-09 (D. Md. 1996). However, Integrated has come forward with no competent evidence that LDDS' knowledge of the MCD Agreement's existence ever coalesced with an intent to ratify it.

Integrated first alleges that LDDS ratified the MCD Agreement during the November 16, 1993 meeting. This meeting, which took place nearly one month after the execution of the MCD Agreement, marked the first time that Integrated officials met with LDDS officials and, according to Integrated, the first time that it informed Hampton and Moore of the Agreement's existence. Integrated further alleges that Hampton and Moore accepted the MCD Agreement as their own and encouraged Integrated to perform accordingly. The evidence,

11

however, contradicts Integrated's allegations. More specifically, the testimony of Integrated's Aguayo suggests that the subject of the November 16, 1993 meeting was the Cable Affiliate Agreement, which bore little to no relation to the MCD Agreement. Aguayo testified at his deposition as follows:

> A: We asked Mr. Moore if he had seen the-- we had an affiliate agreement, but by this time we had drawn up and we had been given a copy, reviewed it. He said that was fine . . . . I asked them if they had a copy of our agreement and I believe -- I'm not sure which, whether it was Mr. Hampton. I don't believe. One of them did and I can't remember which one.

> . . .

> Q: One of them said they had a copy of the agreement between [Integrated] and Net-Tel?

> A: I asked if they had seen a copy of that and I believe one of them -- I think it was Mr. Moore that said because he was the one that reviewed the cable affiliate thing, and he said it was fine. I don't believe Mr. Hampton said, and Mr. Clifford then said, "I'll make sure they get their copy."

> Q: Did that suggest to you that they did not have a copy of the [Integrated]/Net-Tel agreement?

> A: I would say that you suspect that they didn't have a copy from what he said, but I also suspected that they had reviewed it. At least Mr. Moore.

J.A. 106, 226 (emphasis added).

The only reasonable inference to be drawn from Aguayo's testimony is that LDDS, by the time of the November 16, 1993 meeting, had reviewed the Cable Affiliate Agreement, but had not even been made aware of the MCD Agreement's existence. At most, Aguayo suspected that LDDS had reviewed the MCD Agreement. Aguayo's

12

suspicion, however, is insufficient to create a genuine issue of fact precluding summary judgment. See Wilson v. Southwestern Bell Telephone Co., 55 F.3d 399, 405 (8th Cir. 1995) ("Mere suspicion about what may have been in the back of [another's] mind[ ] is not enough to withstand summary judgment . . . . "). Nor may Integrated create a genuine issue by alleging the mere existence of some theoretical argument or "metaphysical doubt" about the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, under the language of Fed. R. Civ. P. 56(e), Integrated must offer "specific facts showing that there is a genuine issue for trial." Aguayo's testimony, which is the only evidence offered by Integrated on this issue, is insufficient to support the allegation that LDDS ratified the MCD Agreement during the November 16, 1993 meeting.

Integrated's next claim is that LDDS ratified the MCD agreement by words, conduct, and/or silence, after the November 16, 1993 meeting. In this regard, Integrated submits a series of three or four phone calls placed to Margaret Harrington, Hampton's administrative assistant, and several additional calls it placed directly to Hampton and Moore -- all of which were initiated by Integrated. Substantively, these conversations were devoid of any acknowledgment of a contractual relationship between LDDS and Integrated. Indeed, on one occasion Aguayo expressed disappointment with the absence of such a relationship, stating that "it appears that it would be better if our agreement [was] directly with [LDDS] as opposed to our existing agreement with Net-Tel." J.A. 422.

Accordingly, we find no evidence that LDDS ever ratified the MCD Agreement. LDDS had no knowledge of the MCD Agreement's existence during the time that Integrated alleges it was ratified. When first notified of the Agreement's actual existence, moreover, Hampton did not in any way indicate his assent. Instead, he made it crystal clear that LDDS was in no way a party to the Agreement.

3.

This brings us to the fundamental and overarching deficiency in Integrated's claims -- that LDDS never assented to a direct contractual relationship with Integrated or to the MCD Agreement between Net-Tel and Integrated. This court cannot enforce a contract unless it

13

can determine the dimensions of that contract. It is not enough that one of the parties believes it has made a contract-- the parties must have collectively expressed their intentions in a manner that is capable of understanding. See Meyers v. Josselyn, 129 A.2d 158, 161 (Md. 1957) ("[w]hen an alleged agreement is so vague and indefinite that the [c]ourt finds it impossible to determine substantially the full intention of the parties, it must be held unenforceable, because the [c]ourt cannot make an agreement for the parties."). Indeed, we cannot lose sight of the fact that a contract is a deliberate agreement of the parties, frequently marked by certain formalities, establishing their own framework of rules to govern their relations.

To find LDDS liable under the MCD Agreement would be to foist the peculiar and special circumstances of that Agreement on LDDS, which never agreed to its terms. At most, LDDS engaged in preliminary negotiations with Integrated regarding the Cable Affiliate Agreement, which LDDS declined to enter into and which LDDS advised Integrated to pursue exclusively with Net-Tel, if at all. Preliminary negotiations, without more, do not form binding contracts.[3]

Here, no contract, written or oral, was ever formed between LDDS and Integrated. Integrated alleges the existence of a contract with LDDS without providing any evidence that LDDS assented to such. While Integrated itself may have intended to create a contract between Integrated and LDDS, Integrated's subjective assent alone cannot substitute for the mutual assent which constitutes a "meeting of the minds" -- an essential element in the formation of every contract. Klein v. Weiss, 395 A.2d 126, 141 (Md. 1978).

At most, LDDS considered a business proposition brought to it by

_____

[3] In fact, the United States Supreme Court has articulated the "highly realistic approach . . . that a contract is ordinarily . . . an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985). It should be noted that the above language from Rudzewicz is most commonly cited in cases involving an analysis of corporate minimum contacts. The distinction drawn between preliminary negotiations and the actual contract, however, is relevant here. See id.

14

Integrated, which LDDS, in the end, decided not to pursue. Ultimately, freedom <u>not</u> to contract should be protected as vigorously as freedom to contract. Accordingly, we find Integrated's claims that LDDS ratified or otherwise assented to the terms of the MCD Agreement to be deficient as a matter of law.

C.

Finally, we consider Integrated's claims that LDDS should be held accountable under the equitable theories of apparent authority and agency by estoppel. Under the doctrine of apparent authority, a principal will be bound by the acts of a person purporting to act for him where "the words or conduct <u>of the principal</u> cause a third party to believe that the principal consents to or has authorized the conduct of the agent." <u>Johns Hopkins Univ.</u> v. <u>Ritter</u>, 689 A.2d 91, 100 (Md. Ct. Spec. App. 1996) (emphasis in original). A similar showing is required to establish agency by estoppel. "Like apparent authority, an agency by estoppel can arise only where the principal, through words or conduct, represents that the agent has authority to act and the third person <u>reasonably</u> relies on those representations." <u>Ritter</u>, 689 A.2d at 100 (emphasis in original). Here, LDDS has made <u>no</u> representations that Net-Tel was an agent with authority to bind LDDS as principal.

1.

Integrated's first allegation is that Net-Tel possessed apparent authority to bind LDDS. We disagree. "Apparent authority results from a principal's manifestation of an agent's authority to a third party, regardless of the actual understanding between the principal and the agent." <u>Auvil</u>, 92 F.3d at 230; <u>see also Homa</u>, 612 A.2d at 333. The principal's manifestations must occur early enough in a transaction that they may fairly be said to have"cause[d] the third party to believe that the principal consents to or has authorized the conduct of the agent." <u>Ritter</u>, 689 A.2d at 100; <u>see also Ehrhardt</u>, 518 A.2d at 156. This mandate requires Integrated to establish that LDDS made some manifestation, prior to the actual execution of the MCD Agreement, that Net-Tel was authorized to enter such on LDDS' behalf. <u>See Ehrhardt</u>, 518 A.2d at 156.

When the MCD Agreement was executed, LDDS had no knowledge that Net-Tel and Integrated were contemplating any agreement, much less one as expansive as the MCD Agreement. Indeed, LDDS had never been in contact with Integrated. Obviously then, LDDS could have done nothing to inspire Integrated's belief that Net-Tel was LDDS' agent. Like an actual agency relationship,"[t]he apparent power of an agent is to be determined by the acts of the principal, and not by the acts of the agent[.]" Homa, 612 A.2d at 335 (internal quotation marks and citation omitted). The record does not support Integrated's contention that LDDS acted so as to confer upon Net-Tel apparent authority to act as LDDS' agent.

2.

Estoppel, however, is not limited to the principal's conduct at the time of contracting, but may also encompass conduct occurring after the execution of the contract. In this respect, the doctrine of estoppel is similar to that of ratification, although the two are technically distinct. In a claim of estoppel, the principal's intent to adopt the agent's conduct is largely without import -- "the crucial factor is reasonable reliance by a third party on the principal's conduct." Ehrhardt, 518 A.2d at 156. We conclude that Integrated's claim for estoppel must fail, specifically because Integrated cannot simply assert that it relied upon LDDS' alleged adoption of the contract. There must be some evidence that its reliance was reasonable. See Ritter, 689 A.2d at 100.

Based upon a single meeting and a few ambiguous conversations with LDDS, and without a written contract with LDDS, Integrated alleges it spent over $100,000.00 in attempting to perform under the MCD Agreement. The unreasonableness of Integrated's acts in this regard is manifest, as was the blind faith that Integrated placed in Net-Tel as LDDS' purported agent:

> The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to stop, look, and listen, and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority[.]

16

Standard Acc. Ins. Co. v. Simpson, 64 F.2d 583, 589 (4th Cir. 1933) (quotations omitted).

Integrated neglected to review the LDDS/Net-Tel Agreement, which stipulated that Net-Tel lacked the authority to enter into binding agreements on behalf of LDDS. Moreover, Integrated concedes that had it so reviewed the LDDS/Net-Tel Agreement, it would not have entered into the MCD Agreement with Net-Tel. Under these circumstances, we decline to protect Integrated from the consequences of its failure to take the reasonable precautions required during the negotiation of a prospective business transaction.

III.

For the reasons set forth above, we conclude that Integrated's claims for breach of contract and breach of implied covenant of good faith and fair dealing fail as a matter of law. Accordingly, we affirm the district court's order granting summary judgment in favor of LDDS.

AFFIRMED

17