57 F.3d 1066
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 MCDEVITT & STREET COMPANY, INCORPORATED, now known as
McDevitt Street Bovis, Incorporated, Plaintiff-Appellant,
v.
SEABOARD SURETY COMPANY; American Home Assurance Company,
Defendants-Appellees,
and
SAE Builders, Incorporated; SAE Engineering & Construction
Company, Incorporated, Defendants,
SPC CONCRETE, INCORPORATED, Defendant and Third Party Plaintiff,
v.
NCNB CHARTER ASSOCIATES; The American Insurance Company,
Third Party Defendants.
 No. 94-2400.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 3, 1995.
Decided: June 19, 1995.
 
 ARGUED: Harry Leigh Griffin, Jr., Griffin, Cochrane & Marshall, Atlanta, GA, for Appellant.
 Robert Paul Thavis, Leonard, Street & Deinard, Minneapolis, MN, for Appellees. ON BRIEF: Robert D. Marshall, Griffin, Cochrane & Marshall, Atlanta, GA; Robert J. Greene, Jr., Greene & Dortch, Charlotte, NC, for Appellant.
 Lowell J. Noteboom, Amy L. Barton, Leonard, Street & Deinard, Minneapolis, MN; Fenton T. Erwin, Jr., Erwin & Bernhardt, Charlotte, NC, for Appellees.
 Before MICHAEL and MOTZ, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal arises out of a general contractor's claim for enforcement of a performance bond against two surety companies that assertedly insured a subcontractor who breached its contract with the general contractor. The court below granted summary judgment in this diversity action in favor of the sureties. We affirm.
 
 I.
 
 2
 McDevitt & Street Company (McDevitt), a general contractor, was awarded the construction contract for the sixty-two-story North Carolina National Bank (NCNB) office building in Charlotte, North Carolina. After receiving the contract, McDevitt solicited bids from subcontractors to perform the concrete structure work. On June 29, 1989, SPC Concrete, Inc. (SPC), a subsidiary of SAE Engineering & Construction Co., Inc. (SAE Engineering), submitted a detailed bid of $10,570,000, which provided that the proposal was valid for 180 days. Shortly thereafter, McDevitt received a letter from the attorney representing SPC's sureties, Seaboard Surety Company (Seaboard) and American Home Assurance Company (American) (collectively "the Sureties"). The letter informed McDevitt that the Sureties "would welcome the opportunity to furnish any required payment or performance bonds ... subject to an accepted review of the final contract terms, conditions, and financing...."
 
 
 3
 McDevitt eventually awarded the concrete subcontract to SPC and, on September 15, 1989, Norman W. Getz, senior vice president of McDevitt, sent a general letter of intent to SPC authorizing it to begin preliminary work until a final agreement could be reached. On October 3, 1989, having received approval from the owner of the project, Getz sent SPC notice to proceed with the concrete construction and notice that it would "need your ... Payment and Performance Bonds (executed on McDevitt & Street's standard form) upon contract execution." (Emphasis added.) SPC then began work on the project. On November 15, 1989, Sherwood L. Webb, McDevitt's senior project manager, sent to SPC three unsigned copies of a lengthy, written subcontract with a total project price of $11,286,256, asking that SPC sign all three copies and return them to McDevitt for final execution. Webb also enclosed payment and performance bonds and asked that SPC have its bonding company endorse the bonds and return them to McDevitt.
 
 
 4
 In the next few weeks, Webb and Jerome LeConte of SPC met on two occasions to discuss the terms of the subcontract. At one of those meetings, held on December 4, Webb provided LeConte with new language for the payment and performance bonds and stated that McDevitt wanted SPC to have its sureties issue the bonds incorporating this new language rather than adopting the forms enclosed in Webb's November 15 letter. On December 15, 1989, LeConte sent Webb a letter that memorialized this request:
 
 
 5
 Further to our two meetings and to our phone conversations, I would like to briefly sum up our position and McDevitt and Street's. Besides the issues we resolved and the few points that remain to be discussed ..., our positions remain far apart on the following items:
 
 1. Bonds
 
 6
 McD & S wants SPC to provide them bonds (performance and payment) in accordance with the typed text given at the December 4th meeting, instead of the form of bond sent by mail with their November 15th letter.
 
 
 7
 SAE checked with their bonding company if this form was acceptable. So far their answer is negative. We would probably have to go and discuss with them face to face.
 
 
 8
 * * *
 
 
 9
 As far as the first payment application is concerned ($330,250 payable on Dec. 22, 1989), you agreed to pay on the basis that SPC gives you an executed payment bond. We look forward to meeting you again, to discuss and resolve the remaining issues.
 
 
 10
 (Emphasis added.)
 
 
 11
 On December 18, 1989, Janet G. Mosley, SPC's contract administrator, sent to McDevitt a fully executed payment bond in the form that Webb had originally requested of SPC on November 15. The subcontractor payment bond had been signed by the Sureties and was in the amount of $11,150,006. The payment bond further acknowledged that SPC "has entered into a written Subcontract" with McDevitt "consisting of furnishing and installing all concrete work for 62 story NCNB Corporate Center, Charlotte, N.C. which Subcontract is hereby referred to and made a part hereof." However, no date was entered in the blank space provided on the payment bond for entry of the date of the subcontract.
 
 
 12
 Although no performance bond was delivered to McDevitt at this time, the Sureties had also executed a performance bond on behalf of SPC, in the form originally requested by McDevitt. Like the payment bond, the performance bond acknowledged the existence of a subcontract for the "furnishing and installing all concrete work for 62 story NCNB Corporate Center, Charlotte, N.C.," but contained no subcontract date. According to the affidavit of Nancy C. Ruano, who signed the payment and performance bonds as attorney-in-fact for the Sureties, the performance bond:
 
 
 13
 was delivered to SPC in this case with the understanding that the performance bond would not be effective until the written subcontract with McDevitt & Street had been executed, the contract date had been inserted into the performance bond form, the performance bond had been delivered to McDevitt & Street, and that the performance bond had been accepted by McDevitt & Street.
 
 
 14
 Ruano's affidavit further states that the Sureties and SPC "had an understanding that SPC would contact [the Sureties] after it had entered into a written contract and provide a copy of that contract to [the Sureties]. The performance bond could not be effective until the contract date was inserted on the performance bond form."
 
 
 15
 On January 11, 1990, LeConte, Webb, Mosley and other SPC and McDevitt representatives met to discuss the terms of the subcontract. According to Mosley, of SPC, the meeting was successful in that "it was felt all issues had been resolved" and "a clean copy of the contract would be prepared." Mosley further concluded that McDevitt and SPC had reached an agreement with respect to the scope of work, price, and conditions of performance. She also recalled that, while no new written document was prepared during the meeting, both sides were "marking up" copies of the original subcontract prepared by McDevitt. Dan Sheehan, who also attended the January 11 meeting on behalf of SPC, recalled that all of the remaining disputes between McDevitt and SPC "were ironed out at that time." Getz, who did not attend the meeting, further stated that LeConte entered his office immediately after the meeting ended and told Getz: "We have a deal." Similarly, McDevitt's project manager, Webb, understood that, following the meeting, McDevitt and SPC "had a contract." On that same day, SPC's LeConte forwarded to Webb a revised payment bond in the form Webb had given to LeConte at their December 4 meeting. Like the original payment bond, the new payment bond was executed by the Sureties. In fact, in all relevant respects, the new payment bond was identical to the old one, including the missing subcontract date. Upon McDevitt's receipt of the new payment bond, the original payment bond was marked "VOID" and returned to SPC.
 
 
 16
 On January 15, 1990, LeConte wrote to Webb thanking him "for the conclusive meeting" four days earlier and "summariz[ing] the few things that remain[ed] to be settled before signing the NCNB contract." Among the items listed, LeConte addressed the issues remaining with respect to the bonds:
 
 
 17
 Performance bond: As discussed, you will tell us if you absolutely request a bond following the new format. Our bonding company is reluctant to issue a bond of such a format and we would prefer not to press them in getting it;
 
 
 18
 Payment bond: We agree to provide you with a payment bond as per the new format (refer to our letter of January 11, 1990).
 
 
 19
 (Emphasis added.) Webb responded on January 22, 1990, in relevant part, as follows:
 
 
 20
 Enclosed are three (3) copies of SPC Concrete Inc.'s Subcontract covering their phase of work on the above referenced project. Please execute all three copies, initialing all pages as indicated and return two copies to this office for our records. Please note that McDevitt & Street has executed this subcontract. We acknowledge that our two firms are in total agreement on all parts of this subcontract as negotiated during the past three months. In reference to your fax and letter dated January 15, 1990, I have addressed the issues as follows:
 
 
 21
 * * *
 
 
 22
 Performance Bond--We do require this bond on the new format. Your bonding company is substantial and should not be overly concerned with this requirement.
 
 
 23
 Payment Bond--Thank you. This has been received.
 
 
 24
 Jerome, I would appreciate it if you could execute this and return to us no later than January 29, 1990. We will require the performance bond and executed contract prior to issuance of the next payment.
 
 
 25
 (Emphasis added.) Although McDevitt amended the attached subcontract to address the concerns raised in the January 11 meeting and in LeConte's January 15 letter, the subcontract was never executed by SPC nor returned to McDevitt.
 
 
 26
 According to Webb's affidavit, with respect to the performance bond, McDevitt:
 
 
 27
 requested that SPC obtain the performance bond on the newer McDevitt performance bond form, although we understood it had already been issued by the surety on the older McDevitt performance bond form. SPC agreed to request that its surety replace the performance bond, as they had done with the payment bond, with the newer McDevitt form. In the meantime, while this request was being pursued with SPC's surety, we expected SPC to deliver the performance bond already issued on the old form, with the understanding that when and if its surety provided a bond on the new form, the old form bond would be turned back to SPC in exchange for the new bond form, as we had done with the payment bond. At no time did I ever tell SPC that we would not accept a performance bond on the old form; I simply told them that I wanted them to try to get the bond re-issued on the new form, as we would prefer that. However, we were quite clear that we had to have a performance bond, and that the old form would be acceptable if they could not persuade their surety to issue a bond on the new form.
 
 
 28
 (Emphasis added.)
 
 
 29
 During this time, SPC's parent company, SAE Engineering, formed a new business entity called SAE Builders. SPC was then consolidated into SAE Builders. On January 26, 1990, Webb and Getz met with LeConte and Fred Westfall, a representative of the newlyformed SAE Builders. At that meeting, Westfall indicated that he was not satisfied with the logistics or the price of the agreement negotiated between SPC and McDevitt on January 11. He considered the written subcontract, as amended, to be "a deliberate attempt on the part of McDevitt & Street to include work not consistent with [SPC's] proposal nor included in [its] price." Westfall also expressed concern that McDevitt had not fully paid SPC for the work it had performed up to that date and demanded that McDevitt tender immediate payment of SPC's second payment application. He further indicated that SAE Builders would not sign the amended subcontract absent several fundamental changes, including a $750,000 increase in price, and would not issue McDevitt its performance bond.
 
 
 30
 The day after the meeting with SAE Builders, Getz wrote a letter to LeConte, which concluded:
 
 
 31
 In accord with our subcontract we expect your prompt execution of the subcontract and delivery of same to M & S along with your executed Performance Bond prior to the release of any additional funds.
 
 
 32
 Westfall responded to Getz's letter on January 30, 1990, stating that "SPC Concrete has been unable to reach a satisfactory contract agreement consistent with our original proposal, dated June 29, 1989, which was to remain firm for 180 calendar days." Westfall went on to say that "SPC Concrete cannot continue in this manner and is requesting a finalized agreement made current and payments brought up to date on or before February 2, 1990."
 
 
 33
 As threatened, on February 2, 1990, SPC abandoned its work on the NCNB building project. At the time it discontinued work, SPC had billed McDevitt for work performed in excess of 1.5 million dollars. That same day, McDevitt filed suit against SPC in state court. A week later, SPC removed the action to the United States District Court for the Western District of North Carolina. McDevitt eventually amended its complaint to name additional defendants, including the Sureties. McDevitt's amended complaint sought damages based upon, inter alia, breach of contract and default of the performance bond. SPC moved for summary judgment with respect to the breach of contract claim, which was denied. The Sureties moved for summary judgment on the performance bond claim and the court granted the motion, without opinion. The parties then filed a stipulated dismissal of all remaining claims in order to render the district court's order a final adjudication on the merits. Following the dismissals, McDevitt timely appealed the order granting of summary judgment in favor of the Sureties on the performance bond to this Court.
 
 II.
 
 34
 We review summary judgment rulings de novo, Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc., 973 F.2d 349, 352 (4th Cir.1992), assessing the evidence in the light most favorable to the party opposing the motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Under such circumstances, summary judgment will be upheld only if it is clear that there is no genuine dispute regarding a material fact and "inquiry into the facts is not desirable to clarify the application of the law." Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir.1990). Of course, summary judgment need not be denied simply because the record contains factual disputes, rather summary judgment is improper only where there are no genuine disputes of material fact. Accordingly, we must inquire as to whether a rational trier of fact could find in favor of McDevitt, the non-movant. Anderson, 477 U.S. at 248-49.
 
 
 35
 Even if there is a genuine dispute as to the existence of a written contract between McDevitt and SPC, the grant of summary judgment to the Sureties would nonetheless have been proper if, as a matter of law, the performance bond was (1) not completed; (2) not delivered; or (3) not accepted by McDevitt. As the parties agree, all three elements are required by North Carolina law in order for a bond to be enforceable. See Ballard v. Ballard, 55 S.E.2d 316, 319-20 (N.C.1949). The Sureties assert that the performance bond at issue here was not completed, delivered or accepted. We need only address acceptance.
 
 
 36
 Physical possession of a bond is not necessary for acceptance of its delivery. Ballard, 55 S.E.2d at 319. Furthermore, the grantee's acceptance of delivery "is presumed until the contrary is shown if the conveyance be beneficial to [the grantee]." Id. at 320. Nevertheless, if the grantee expressly rejects delivery there is of course no acceptance. See 1 Samuel Williston, A Treatise on the Law of Contracts Sec. 2:10, at 109 (Richard A. Lord ed., 4th ed.1990).
 
 
 37
 The Sureties assert that here the grantee, McDevitt, did expressly reject the bond. They rely on the fact that less than three weeks after requesting the performance bond on the old form, McDevitt stated that it wanted the bond to be on the new form. When SPC attempted to obtain the bond on the new form, it met with immediate resistance from its sureties. As it reported to McDevitt on December 15, 1989, "[s]o far their answer is negative." Again on January 15, 1990, SPC's LeConte wrote to McDevitt's Webb:
 
 
 38
 As discussed, you will tell us if you absolutely request a bond following the new format. Our bonding company is reluctant to issue a bond of such a format and we would prefer not to press them in getting it.
 
 Webb responded one week later:
 
 39
 We do require th[e performance] bond on the new format. Your bonding company is substantial and should not be overly concerned with this requirement.
 
 
 40
 * * *
 
 
 41
 We will require the performance bond and the executed contract prior to issuance of the next payment.
 
 
 42
 (Emphasis added.)
 
 
 43
 The import of Webb's characterization of the new performance bond format as a "requirement" is that McDevitt would only accept a performance bond completed on the new form. In effect, by explicitly requiring that the performance bond be issued in the new format, McDevitt defeated the general presumption of acceptance that attaches to deliveries beneficial to the recipient. In this case, as the exchanges between LeConte and Webb demonstrate, there was no mutual agreement between the two regarding the type of performance bond that would be acceptable. Whether one views Webb's "requirement" that the bond be issued on the new form as a rejection of an offer to deliver the bond on the old form or as a counteroffer, the result is the same--McDevitt did not accept delivery of the old form performance bond. See Normile v. Miller, 326 S.E.2d 11, 15 (N.C.1985). Absent some evidence of McDevitt's intent to accept a performance bond on the old form, McDevitt must be deemed to have irrevocably rejected delivery of the performance bond executed by the Sureties as a matter of law. See Restatement (Second) of Contracts Sec. 104(3), at 273 (1981); Williston Sec. 2:10, at 109 ("where the grantee or obligee disclaims or rejects a sealed instrument, his disclaimer or rejection is irrevocable, despite the fact that by its terms and in legal effect no acceptance is necessary").
 
 
 44
 McDevitt claims its intent to accept the performance bond in the original form is demonstrated in three ways. First, McDevitt notes that on February 1, 1990, it demanded that "an executed performance bond (which is ... in the possession of SPC Concrete)" be delivered to it, and asserts this evidences McDevitt's acceptance of the bond in the old form. Second, McDevitt relies heavily on the affidavit of its employee, Sherwood Webb. In this affidavit, prepared for litigation, Webb asserts that he merely "requested that SPC obtain the performance bond on the newer McDevitt performance bond form...." He further asserts that:
 
 
 45
 At no time did I ever tell SPC that we would not accept a performance bond on the old form; I simply told them that I wanted them to try to get the bond re-issued on the new form, as we would prefer that. However, we were quite clear that we had to have a performance bond, and that the old form would be acceptable if they could not persuade their surety to issue a bond on the new form.
 
 
 46
 Third, McDevitt emphasizes that it accepted the payment bond executed by the Sureties on the old form and did not return it to SPC until SPC delivered the payment bond executed on the newer form; McDevitt asserts that this demonstrates an accepted course of conduct between the parties.
 
 
 47
 McDevitt's February letter evidences nothing about its intent in December and January. If it intended to reject the bond in December and January, it does not matter if it changed its mind in February. Moreover, the February letter says nothing about the form of the bond "demanded" and so provides little evidence even that McDevitt was prepared in February to accept a performance bond on the original form.
 
 
 48
 McDevitt's attempt to have Webb recharacterize what is clearly denominated as a "requirement" in his January letter that the performance bond be issued on the new form, to merely a "preference" that this be done, finds no support in the record. Notwithstanding Webb's assertion in his affidavit that McDevitt and SPC "were quite clear ... that the old form would be acceptable ...," there is nothing in the record to indicate that McDevitt's willingness to accept the old bond form was ever communicated to SPC or the Sureties. On the contrary, judging from the correspondence in the record regarding McDevitt's unwillingness to accept the old performance bond, SPC could only reasonably interpret McDevitt's terms as requiring that the performance bond be issued in the new format. The fact that Webb subjectively may have been willing to settle for a performance bond issued on the old form, as his affidavit indicates, is irrelevant. See Grady v. Grady, 224 S.E.2d 282, 283 (N.C.App.1976) ("[a]bsent fraud or mistake the undisclosed intention of either party is immaterial"). SPC is not, and cannot be, expected to divine Webb's subjective intent, especially when his objective intent is so clearly expressed in writing.
 
 
 49
 Webb's assertion that "the old form would be acceptable if [SPC] could not persuade [its] surety to issue a bond on the new form," is inconsistent with his response to LeConte's letters concerning the performance bond issue. On two separate occasions, LeConte notified Webb that the Sureties were unwilling to execute the performance bond on the newer form. On December 15, 1989, LeConte wrote to Webb:
 
 
 50
 SAE checked with their bonding company if this [newer] form was acceptable. So far their answer is negative.
 
 
 51
 (Emphasis added.) One month later, LeConte again informed Webb:
 
 
 52
 As discussed, you will tell us if you absolutely request a bond following the new format. Our bonding company is reluctant to issue a bond of such a format and we would prefer not to press them in getting it....
 
 
 53
 (Emphasis added.) Notwithstanding LeConte's obvious apprehension as to obtaining a new form performance bond, Webb responded by informing LeConte that McDevitt would "require" issuance of the performance bond on the new form. If Webb had been willing to accept the old performance bond, rather than no bond at all, as he asserts in his affidavit, LeConte's expressions of reluctance should have signalled Webb to so indicate in his January 22 letter. Instead, Webb demonstrated his unwillingness to negotiate by assuming a steadfast position requiring issuance of the bond on the new form.
 
 
 54
 Accordingly, to the extent that Webb's affidavit contradicts his January 22 statements to LeConte, the court below was justified in disregarding Webb's contrary affidavit statements. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975-76 (4th Cir.1990) (where summary judgment record contains affidavit which contradicts prior statements by affiant, affidavit may be disregarded). In other words, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting[statements] of the plaintiff[ ] ... is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984).
 
 
 55
 McDevitt also argues that the Sureties should have inferred McDevitt's willingness to accept the old bond form temporarily based on McDevitt's prior course of conduct with respect to the payment bond. It seems to us that a single occurrence--McDevitt's acceptance of the payment bond in the original form, prior to the Sureties' issuance of a replacement payment bond on a new form--is insufficient to establish a course of conduct. This is particularly so in view of the fact that payment and performance bonds serve different purposes and the payment and performance bonds in this case were treated differently by the parties. The payment bond in original form was delivered directly to McDevitt, while the performance bond never was. Thus, McDevitt's retention of the original payment bond evidenced only McDevitt's acceptance of the payment bond sent in that form. On the other hand, McDevitt never had physical custody of the original performance bond and so cannot rely on its retention of the original performance bond to evidence similar intent with regard to that bond. Moreover, even if McDevitt, through its acceptance of the old payment bond form, had implied it would accept future bonds executed on the old form, McDevitt's subsequent requirement (as set forth in its meetings with SPC and in Webb's letter) that the performance bond be on the new form effectively terminated any prior course of conduct.
 
 III.
 
 56
 In conclusion, the record demonstrates no genuine dispute that McDevitt rejected the performance bond issued by the Sureties in the old format. Accordingly, as a matter of law, the performance bond was never accepted by McDevitt. This holding alone is a sufficient basis on which to grant summary judgment to the Sureties. Therefore, we need not reach the questions of whether the bond was sufficiently completed or delivered, or whether the underlying subcontract was ever executed or agreed upon. Without McDevitt's acceptance of the performance bond, the bond was legally unenforceable.
 
 
 57
 AFFIRMED.