INTEGRATED CONSULTING
SERVICES, INC.,
Plaintiff,

v.

LDDS COMMUNICATIONS,
INC., Defendant.

LDDS COMMUNICATIONS, INC.,
Counterclaim Plaintiff,

v.

INTEGRATED CONSULTING
SERVICES, INC., Coun-
terclaim Defendant.

No. Civ.A. AW–95–1707.

United States District Court,
D. Maryland.

Jan. 30, 1998.

Sheldon N. Jacobs, Andrew George Slutkin, Stephen L. Snyder, Baltimore, MD, for plaintiff Integrated Consulting Services, Inc.

William D. Nussbaum, David G. Leitch, Richard Henry Gordin, Washington, D.C., for defendant LDDS Communications, Inc.

## MEMORANDUM DECISION

WILLIAMS, District Judge.

### I

Presently before the Court is defendant's motion for summary judgment. In ruling on the motion, the Court has considered the briefs of the parties, the arguments of counsel at a hearing in open court, and the entire record. For the reasons that will follow, the Court will grant the motion.

### II

Erwin Aguayo, Jr., ("Aguayo") and Robert Post ("Post") decided in late 1993 to form a business soliciting long-distance telephone customers through advertising on cable television. Their new business, Integrated Consulting Services ("ICS"), would persuade cable T.V. operators to air advertisements soliciting viewers to subscribe to the telephone service being offered. The cable companies would also insert mailers into their monthly bills encouraging customers to sign up for long distance service. The cable operators would be compensated by receiving a percentage of the revenue generated through long-distance subscriptions resulting from the campaign. ICS was to provide long-distance telephone service through LDDS Communications ("LDDS").

ICS did not deal directly with LDDS in securing the provision of long-distance service. ICS dealt with Net–Tel Management Group ("Net–Tel"). Net–Tel contracts with LDDS to provide long-distance subscribers in exchange for a percentage of revenues. By the terms of its agreement with LDDS, Net–Tel was to be paid a percentage of the long-distance revenues generated by any customer Net–Tel brought in. Net–Tel was specifically prohibited from entering into agreements on LDDS' behalf or obligating LDDS in any way. (See Def.'s Ex. I.) However, Michael Clifford ("Clifford"), Net–Tel's president, told Aguayo that Net–Tel had express authority from LDDS to develop programs for them. (Aguayo Dep., Pl.'s Ex. B, p. 59.)

On October 23, 1993, after a period of negotiations, ICS signed an agreement with Net–Tel. The agreement, entitled Master Independent Distributor Agreement ("MIDA") was a standard contract that Net–Tel entered into with all of its distributors. The agreement simply detailed ICS'

role as an independent contractor to Net–Tel, and explained that Net–Tel's only obligation was to remit to ICS a percentage of revenue for all sales generated by ICS. LDDS was not mentioned in the agreement. (Def's Ex. J.) On October 28, 1993, ICS and Net–Tel entered into another contract—this time drafted by ICS. This contract, the Master Corporate Distributor ("MCD") agreement, provided that "Net–Tel is an agent of [LDDS]" and that "[LDDS] has authorized Net–Tel to enter into independent distributor agreements with third parties, for the marketing and sales of [LDDS'] telephone services." Most of the obligations under the agreement, including "marketing assistance in the form of pre-recorded television advertising spots, and creative work for printed advertising pieces," were to be provided by Net–Tel. (Def.'s Ex. K.) Though the contract stated that the billing for the long-distance service was to be done by LDDS, the agreement further provided that "Net–Tel will pay ICS" all earned commissions. (Def.'s Ex. K, MCD Agreement, Schedule 1.) The contract was signed by representatives of ICS and Net–Tel. LDDS was unaware of the agreement when it was executed.

Shortly after entering into the agreement, On November 16, 1993, Aguayo, along with Net–Tel representatives Clifford, Roger Depew and Mark Bronkowski, met with two executives from LDDS. The LDDS representatives were H. Trezvant Moore, Vice-President in Charge of Alternate Channel Marketing, and George Hampton, Manager of Marketing Programs. At the meeting, Aguayo explained the cable T.V. program to the LDDS executives. The LDDS executives explained that they had failed in a previous attempt to develop a cable T.V. marketing campaign. Aguayo attempted to persuade the executives that the ICS marketing program was different and would be successful. According to Aguayo, the LDDS representatives affirmed to him that Net–Tel was authorized to enter into the agreement with ICS. Mr. Aguayo further stated that Mr. Moore led him to believe that he had reviewed the "cable affiliate thing," and told

Aguayo that "it was fine." (Aguayo Dep., Pl.'s Ex. B, p. 83.)

Less than a month after the meeting, ICS sent a marketing plan the Net–Tel, which was forwarded to LDDS. Mr. Moore reviewed the plan. The plan read, in part, "[LDDS], using its existing agency agreement with Net–Tel Telecommunications Management Group, has secured the services of Integrated Consulting Services, Inc., as a qualified organization to provide the cable marketing expertise needed to implement the elements of this plan." When asked if anyone at LDDS had disagreed with Aguayo's remarks, Moore could not recall.

ICS subsequently proceeded with its attempts to develop the plan. ICS contacted LDDS to attempt to secure marketing materials for the proposed solicitations. LDDS sent the marketing materials. ICS contacted LDDS 4–10 more times to keep them updated ICS' progress. After persuading cable operators to go along with the campaign, ICS ran into financial difficulties in producing the commercial. ICS attempted to convince Net–Tel to pay for the production expenses. When Net–Tel refused, ICS attempted to renegotiate the contract to receive a higher percentage of the commission revenue in exchange for bearing the production costs of the commercial. Shortly thereafter, Net–Tel notified ICS that it was terminating its contract because of ICS' continued direct contact with LDDS.

In mid-April of 1994, Aguayo wrote to Hampton, the LDDS officer, summarizing the events up to that point and explaining that ICS had relied on the representations of LDDS and Net–Tel, spending many months and thousands of dollars fulfilling its obligations under the agreement. In the letter Aguayo explained that "it appears that it would be better if our agreement is directly with [LDDS] as opposed to our existing agreement with Net–Tel." (Def's Ex. M, ¶ 1.) In reply, Hampton wrote Mr. Aguayo emphasizing that LDDS had no previous formal relationship with ICS. Shortly thereafter, plaintiff brought the instant suit against LDDS.[1] The suit claims breach of contract, breach of covenant of good faith and fraud.

---

1. It is interesting to note that plaintiff has not

brought suit against the financially strapped Net–

ICS' agreement with Net–Tel gives ICS the right to review Net–Tel's contract with LDDS, but ICS never requested the opportunity to review the agreement. ICS concedes that had it reviewed the agreement between Net–Tel and LDDS, it would not have entered into the agreement.

## III

### A.

Summary judgment is appropriate where there is no genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the non-movant is to be believed and all justifiable inferences drawn in his favor, but a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *Runnebaum v. NationsBank of Md., N.A.,* 123 F.3d 156, 164 (4th Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985)).

### B.

In its complaint, ICS advanced claims of breach of contract (Count I), breach of covenant of good faith (Count II), fraud in the inducement (Count III), and constructive fraud (Count IV). In its briefing and at oral argument, ICS has abandoned its fraud claims. Based on this, and the absence of any evidence in the record to support such claims, the Court will grant LDDS' motion for summary judgment with respect to Counts III and IV.

### C.

■ LDDS contends that there are no disputes of material issues of fact and that it is entitled to judgment as a matter of law on the contract claims as well. The contract at issue here is the MCD agreement, executed by representatives of ICS and Net–Tel. ICS contends that LDDS is responsible for the obligations of Net–Tel under the contract because Net–Tel entered the contract as LDDS' agent.

■ Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency, § 1(1) (1958). The existence of an actual agency relationship may be established by written agreement or inference. *Patten v. Board of Liquor,* 107 Md.App. 224, 238, 667 A.2d 940 (1995). In this case, there was no written agreement creating an agency relationship. Indeed, the agreement between LDDS and Net–Tel specifically provides that Net–Tel is cannot act on LDDS' behalf. ICS is thus left to argue that an agency relationship was created by inference. To establish a principal-agent relationship by inference, it must be shown that 1) the agent was subject to the principal's right of control; 2) the agent had a duty to primarily act for the benefit of the principal; and 3) the agent held the power to alter the legal relations of the principal. *Schear v. Motel Management Corp.,* 61 Md. App. 670, 687, 487 A.2d 1240 (1985), quoting Restatement (Second) of Agency, §§ 12–14 (1958).

■■ In support of its argument, ICS points to statements of a Net–Tel representative that Net–Tel was LDDS' "number one agent," as well as contractual language in ICS' agreement with Net–Tel declaring that "Net–Tel is an agent of [LDDS]" and that LDDS "has authorized Net–Tel to enter into independent distributor agreements with third parties, for the marketing and sales of [LDDS's] telephone services." It is clear, however, that Net–Tel's statements cannot establish the existence of an agency relationship. "The authority of an agent must come from the principal...." *Homa v. Friendly Mobile Manor,* 93 Md.App. 337, 359, 612 A.2d 322 (1992). Actual authority only exists where "the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it." *Id.* at 360, 612 A.2d 322. ICS also points to the deposition

testimony of Mr. Aguayo claiming that Mr. Moore of LDDS told Aguayo, after the execution of the agreement, that Net–Tel was "authorized" to enter the agreement. To the extent that this statement suggests that Net–Tel had the power to bind LDDS, however, it is clearly contrary to the language of the Net–Tel/LDDS contract. To prove an agency relationship by implication, there must be factual evidence in the record supporting the implication that the putative agent acted as such. A mere proclamation of agency is insufficient. See 3 Corpus Juris Secundum, Agency, § 138, p. 6 ("Whether a particular relationship is an agency depends on the relations of the parties as they in fact exist, without regard to what they call their relationship").

That Net–Tel merely solicited business for LDDS does not create an agency relationship by implication. The decision of the Maryland Court of Special Appeals in *Schear* is instructive on this point. In *Schear*, the plaintiffs had valuables stolen from their room in the Chevy Chase Holiday Inn ("Chevy Chase"). The plaintiffs brought a claim against the franchisor of the hotel, Holiday Inns, Inc. ("Holiday Inn"), claiming that it was liable for the alleged negligence of its franchisee under a theory of agency. The contract between Holiday Inn and Chevy Chase provided that "the parties hereto are not ... agents of the other in any sense" and that "neither has power to obligate or bind the other." The court rejected the plaintiff's claim of an implied agency, observing that Holiday exercised no control over Chevy Chase, or vice versa. "The control element was totally lacking in this case.... Although [Holiday Inn] retained the right to conduct periodic inspections as a means of insuring adherence to Holiday Inn standards, it took no part in the day-to-day operation of the hotel. [Chevy Chase] merely purchased a product from [Holiday Inn]—a uniform system of inn service—that carried with it an obligation to maintain certain standards prescribed by the seller. But the fact that one of the parties has subsidiary duties to act for the interests of another, as where a purchaser of goods from a manufacturer agrees that he will advance the interests of the manufacturer in certain respects, does not create an agency relation with respect to the sale." *Schear*, 61 Md.App. at 688, 487 A.2d 1240 (quotation omitted).

■ Similarly, the fact that in this case Net–Tel and LDDS had an agreement to work together does not lead to the conclusion that one was the agent of the other. Clearly, the term "authorized agent," as employed by Moore, referred to someone who brought in clients for LDDS, for which LDDS would, in return, remit a percentage of revenues. Under the contract between LDDS and Net–Tel, LDDS did not prescribe the manner or means by which Net–Tel generated business. Further, under the agreement Net–Tel did not have the authority to compel LDDS to accept the customers that Net–Tel brought in. Nothing in the record suggests that the relationship between LDDS and Net–Tel was, in fact, any different than described by the contract. Under Maryland law, "[a]n agency relationship is not simply an employer/employee or contractor/subcontractor relationship.... [N]ot every fiduciary relationship automatically equates to an agency relationship." *Patten*, 107 Md.App. at 224, 667 A.2d 940. There is no factual support in the record for the conclusion that Net–Tel was subject to LDDS' control or had the authority to bind LDDS. An agency relationship cannot be established by inference on the facts of this case. The Court must conclude, as a matter of law, that no agency relationship existed between Net–Tel and LDDS.

■ Alternatively, ICS argues that Net–Tel should be treated as the agent of LDDS based on equitable theories of apparent authority or agency by estoppel. Under the doctrine of apparent authority, a principal will be bound by the acts of a person purporting to act for him where "the words or conduct of the principal cause the third party to believe that the principal consents to or has authorized the conduct of the agent." *Johns Hopkins University v. Ritter*, 114 Md. App. 77, 96, 689 A.2d 91 (1996); *Parker v. Junior Press Printing Service*, 266 Md. 721, 727–28, 296 A.2d 377 (1972). A similar showing is required to establish agency by estoppel. "Like apparent authority, an agency by

estoppel can arise only where the principal, through words or conduct, represents that the agent has authority to act and the third party reasonably relies on those representations." *Johns Hopkins,* 114 Md.App. at 96, 689 A.2d 91. However, again, LDDS had no knowledge of ICS when the contract was entered into; obviously, LDDS did nothing to inspire ICS' belief that Net–Tel was LDDS' agent. Like an actual agency relationship, "[t]he apparent power of an agent is to be determined by the acts of the principal, and not by the acts of the agent." *Homa,* 93 Md.App. at 363, 612 A.2d 322. The record cannot support ICS' contention that Net–Tel had apparent authority to act as LDDS' agent.

 Estoppel, however, is not limited to the conduct of the principal at the time of contracting and may also encompass conduct taking place after the execution of the contract. "There may even be liability based on a failure to speak, as where one knows that another is purporting or has purported to contract as his agent . . . and fails to reveal the facts. . . . In some situations in which silence is maintained, authority, or ratification results, and, if so, liability can be based upon ordinary agency principles." *Garfinkel v. Schwartzman,* 253 Md. 710, 721, 254 A.2d 667 (1969).

 In addition, liability may be premised upon an after-the-fact contractual adoption based on a theory of "ratification." "The doctrine of ratification provides that a contract made by an agent without authority may, by words, conduct or silence, subsequently be approved by the principal, retroactively conferring authority on the agent." *Bruffey Contracting v. Burroughs,* 522 F.Supp. 769, 774 (D.Md.1981); *Citizens Bank of Md. v. Md. Industrial Finishing,* 338 Md. 448, n. 9, 659 A.2d 313 (principal may 'ratify' originally unauthorized act of agent).

 The doctrines of estoppel and ratification, while technically distinct, are closely related. The key distinctions appear

to lie in the elements of reliance and intent. See, e.g., 2A Corpus Juris Secundum, Agency, §§ 63–64; 3 Am.Jur.2d Agency § 184 (1986). Reliance is not an element of "ratification;" the guiding consideration is whether the principal, with knowledge of all material facts, intended to ratify the conduct of the would-be agent. *Progressive Casualty v. Ehrhardt,* 69 Md.App. 431, 442, 518 A.2d 151 (1986). By contrast, in a claim of estoppel the principal's intent to adopt the agent's conduct is less important to the inquiry— "the crucial factor is reasonable reliance by a third party on the principal's conduct." *Id.* at p. 441, 518 A.2d 151.

 On the facts here, there is clearly no basis for a claim of ratification. "Ratification requires an intention to ratify and knowledge of all material facts." *Progressive Casualty,* 69 Md.App. at 442, 518 A.2d 151 (citations omitted). ICS points to no evidence that LDDS was aware of the details of ICS' MCD agreement with Net–Tel, much less evidence of an intention to ratify the agreement. According to their depositions, no LDDS employee saw the MCD agreement until April of 1994.[2] See Def.'s Ex. G at 14; Def.'s Ex. C at 155; Def.'s Ex. B at 165–166. In his deposition, Mr. Aguayo stated that he "suspect[ed] that [the LDDS representatives] didn't have a copy [of the agreement], but I also suspected that they had reviewed it. At least Mr. Moore." (Aguayo Dep., Pl.'s Ex. B, p. 83.) He based this "suspicion," however, on Mr. Moore's statement that "he was the one that reviewed the cable affiliate thing, and he said it was fine." *Id.* While Mr. Moore may have had knowledge of ICS' plan to market to cable television stations, the fact that he "reviewed the cable affiliate thing," provides no evidence that he reviewed the MCD agreement between Net–Tel and ICS. There is no evidence in the record supporting the conclusion that LDDS knew the terms of the agreement it had supposedly ratified. Inasmuch as knowledge of the material facts

**2.** It was in April of 1994 that Mr. Aguayo wrote his letter to LDDS summarizing the prior events and suggesting that "it would be better if our agreement is directly with [LDDS] as opposed to our existing agreement with Net–Tel." (Def's

Ex. M, ¶ 1.) Shortly after receiving Mr. Aguayo's letter, Mr. Hampton replied by letter making clear that "[t]here is no existing Representation Agreement . . . in place between [LDDS] and [ICS]." Defs. Ex. O, ¶ 3.

is an essential element of ratification, this claim must be rejected.

Finally, ICS' claim for estoppel must fail as well. ICS cannot sustain its cause of action on a theory of estoppel simply by pointing to evidence that it relied upon LDDS' ratification or adoption of the contract—there must also be evidence that the reliance was reasonable. E.g., *Johns Hopkins*, 114 Md.App. at 96, 689 A.2d 91.

ICS once again points to the deposition testimony of Mr. Aguayo claiming that Mr. Moore of LDDS "assured" him of Net–Tel's authority to act on LDDS' behalf in dealing with ICS. Aguayo's testimony, however, suggests little more than the fact that LDDS was not opposed to ICS, or anyone else, attempting to solicit more customers for them. Aguayo could not reasonably infer from this that LDDS specifically adopted contractual obligations that Net–Tel incurred. According to Aguayo's deposition testimony, at the meeting with LDDS, LDDS representatives affirmed that Mr. Clifford and Net–Tel were "authorized to enter into our kind of agreement." (Aguayo Dep., Pl.'s Ex. B, p. 82.) While this may well suggest that Net–Tel was permitted to enter into its venture with ICS, this could not reasonably lead ICS to conclude that Net–Tel was authorized to enter into the contract on *LDDS' behalf.* "[A] third person must use reasonable diligence and prudence to ascertain whether an agent is acting within the scope of his or her powers." *Hill v. State*, 86 Md.App. 30, 35–36, 585 A.2d 252 (1991). The Fourth Circuit has explained that under Maryland law, "[t]he mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to 'stop, look and listen,' and he who would bind the principal is bound to ascer-

tain, not only the fact of agency, but the nature and extent of the authority ...." *Standard Acc. Ins. Co. v. Simpson*, 64 F.2d 583, 589 (1933); see also *Springfield Television, Inc. v. Gary*, 628 S.W.2d 398, 403 (Mo. App.1982) ("a person dealing with a supposed agent has a duty to ascertain for himself the fact and scope of agency and must display that degree of common sense which distinguishes good faith from blind faith"). LDDS accurately points out that ICS had just such an opportunity to "stop, look, and listen." The contract between ICS and Net–Tel permits ICS to examine Net–Tel's contract with LDDS. (See Def.'s Ex. I.) As previously discussed, it is clear from this contract that Net–Tel was not authorized to enter into any contractual relationship on behalf of LDDS. Yet, ICS never availed itself of its right under its contract with Net–Tel to determine the exact scope of its powers as a supposed agent of LDDS. At the meeting with LDDS, ICS representatives never asked for a copy of the agreement or asked whether Net–Tel was authorized to enter into agreements on behalf of LDDS.[3] In light of the fact that ICS failed to even produce a copy of its MCD agreement with Net–Tel for LDDS' inspection at the time of the meeting, reasonableness required nothing less than some inquiry by ICS as to whether LDDS would assume Net–Tel's obligations under the heretofore unseen agreement. The actions of LDDS at the meeting with ICS were insufficient to reasonably justify the belief that LDDS had accepted the obligations of Net–Tel under the MCD agreement.

ICS also points to the marketing plan that it developed, and sent to LDDS, which reads, in part, that "[LDDS], using its existing agency agreement with Net–Tel Telecommunications Management Group, has

3. Mr. Aguayo has filed an affidavit in which he claims that LDDS executives told him that Net–Tel was authorized as LDDS' agent "to act on their behalf in working with my company to launch the Cable Affiliate Program." (Pl.'s exh. A at 3.) Mr. Aguayo, however, never stated in his extensive deposition that he was told at the meeting that LDDS authorized Net–Tel to *enter into agreements on its behalf.* Indeed, he seemed to acknowledge in his subsequent letter to LDDS that the "existing agreement [was] with Net–

Tel." (Def's Ex. M, ¶ 1.) To the extent that his affidavit is to the contrary, it is insufficient, in and of itself, to create a factual issue as to whether LDDS told him that Net–Tel had the authority to bind LDDS. See *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975–76 (4th Cir.1990) (where summary judgment record contains affidavit which contradicts prior statements by affiant, affidavit may be disregarded); *McDevitt v. Seaboard Surety*, 57 F.3d 1066 (4th Cir.1995) (unpublished).

secured the services of Integrated Consulting Services, Inc., as a qualified organization to provide the cable marketing expertise needed to implement the elements of this plan." ICS argues that because of LDDS' failure to object to this language, it should now be estopped from denying the fact that the agreement is, in fact, between ICS and LDDS. However, LDDS' failure to respond to this plan cannot reasonably be viewed as an acceptance of the contract. The marketing plan, while outlining ICS' general course of action, provides LDDS no clue as to the contractual obligations to which it has supposedly acquiesced. See *University Marketing v. Hartford Life,* 413 F.Supp. 1250, 1260 (E.D.Pa.1976) ("A careful reading of the letter ... reveals that it is nothing more than an informational description of the campus calender, (the subject of the contract]. It is clear that the failure to answer this letter could raise no inference in the minds of reasonable men that [the defendant] had ratified the purported contract"). Moreover, ICS did not send the marketing plan to LDDS—the plan was sent to Mr. Clifford of Net–Tel. While ICS observes that the plan was forwarded to LDDS, ICS cites no evidence that it *knew* that the plan had been forwarded to LDDS. ICS could not have reasonably relied on LDDS' silence when ICS presented the marketing plan to Net–Tel, rather than LDDS. See *Progressive Casualty,* 69 Md.App. at 441, 518 A.2d 151 (agency by estoppel requires "reasonable reliance ... on *the principal's* conduct"). Absent any showing of reasonable reliance on the conduct of LDDS, ICS' claim agency by estoppel must fail as a matter of law.

To conclude, the contract at issue here was between Net–Tel and ICS. Because the evidence in the record is insufficient to support a finding of an actual or apparent agency relationship between Net–Tel and LDDS, ICS' breach of contract claim against LDDS must fail as a matter of law. Similarly, ICS' claim of breach of covenant of good faith cannot stand. See *Parker v. Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521 (1992), cert. den. 327 Md. 524, 610 A.2d 796 (1992) (implied duty of good faith only applicable to a party to a contract). LDDS is entitled to judgment as a matter of law on Counts I and II of the complaint.

### IV

For the reasons set forth, the Defendants, motion for summary judgment must be granted as to all counts. By consent motion of the parties, defendant's counterclaim is dismissed. A separate order will issue.

### ORDER

In accordance with the Memorandum Decision, it is this 30th day of January, 1998, by the United States District Court for the District of Maryland, Southern Division, hereby ORDERED:

1. That Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED;**

2. That Defendant's counterclaim be, and the same hereby is, **DISMISSED;**

3. That the Clerk of the Court CLOSE this case; and

4. That the Clerk of the Court mail copies of this Order to all parties of record.